UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSERVATION CONGRESS,<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES FOREST SERVICE,<br><br>    Defendant. | No. 2:18-cv-02404-JAM-CKD<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

I. INTRODUCTION

In late 2017, the Cove Fire blazed through thousands of acres in the Modoc National Forest. Following the fire, Defendant United States Forest Service (the "Forest Service") developed and implemented the Cove Fire Salvage and Restoration Project (the "Project") to remove fire-damaged trees in the area. Before this Court is Plaintiff Conservation Congress's Motion for a Preliminary Injunction challenging the Project. Mot., ECF No. 11. Conservation Congress seeks an Order from this Court ordering the Forest Service to conduct additional surveys prior

1

to logging, designate habitat, and prohibit activities that impact habitat. Prelim. Inj. Mem., ECF No. 17. The Forest Service opposes this Motion. Opp'n, ECF No. 22.[1] For the reasons set forth below, the Court denies Plaintiff's Motion.

## II. BACKGROUND

The Cove Fire ravaged 30,774 acres, over half of which experienced high to very high burn severity and over 75 percent tree mortality. AR 20-22. The Project seeks to salvage fire-killed and fire-injured trees on approximately 982 acres within the perimeter of the Cove Fire, remove roadside hazard trees on 398 acres, and perform fuel and slash treatment and reforest 1,380 acres. AR 29. After completing a draft Environmental Assessment, the Forest Service issued a Decision Notice and Finding of No Significant Impact for the Project, followed by the final Environmental Assessment. Compl., ECF No. 1, pp. 19-20.

The Forest Service utilized the Emergency Situation Determination procedure to begin the Project immediately upon agency approval. Compl. at 23, 26-27. The Forest Service has already completed logging in the Barber Canyon area of the Project and Conservation Congress seeks to enjoin the next phase in Dutch Flat Creek. Mot. at 5. Conservation Congress challenges the Project, arguing that it inadequately analyzed impact on two species: the Northern Goshawk, a bird, and the Modoc Sucker, a fish.

///

///

---

[1] This motion was determined to be suitable for decision without oral argument. E.D. Cal. L.R. 230(g).

III. LEGAL STANDARDS

A. <u>Preliminary Injunction Standard</u>

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 22 (2008). A plaintiff must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. <u>Id.</u> at 20.

B. <u>Review of Federal Agency Actions Under the APA</u>

Plaintiff's claims are based on three federal statutes: the National Environmental Policy Act ("NEPA"), the National Forest Management Act ("NFMA"), and the Administrative Procedure Act ("APA"). The APA supplies the Court with the authority to review federal agency decisions under NEPA and the NFMA. <u>All. for the Wild Rockies v. Pena</u>, 865 F.3d 1211, 1216–17 (9th Cir. 2017). Under the APA, a reviewing court may only overturn agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Arbitrary and capricious review is narrow and does not allow a court to substitute its judgment for that of the agency. <u>Earth Island Inst. v. U.S. Forest Serv.</u>, 697 F.3d 1010, 1013 (9th Cir. 2012). An agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983) (quoting <u>Burlington Truck Lines v.</u>

United States, 371 U.S. 156, 168 (1962)). Courts are particularly deferential "when reviewing an agency's technical analyses and judgments involving the evaluation of complex scientific data within the agency's technical expertise." League Of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen, 615 F.3d 1122, 1130 (9th Cir. 2010).

"An agency action is arbitrary and capricious 'only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Pena, 865 F.3d at 1217 (quoting Defs. of Wildlife v. Zinke, 856 F.3d 1248, 1257 (9th Cir. 2017)).

IV. OPINION

A. Likelihood of Success on the Merits

Conservation Congress's Complaint alleges nine claims under NEPA, the NFMA, and the APA. See Compl. The Court confines its inquiry about the likelihood of success to the three claims upon which Conservation Congress relies in its Motion for Preliminary Injunction: the Fourth, Fifth, and Seventh claims. See Mot at 5.

1. Fourth Claim: Compliance with the Sierra Nevada Amendment and Modoc Plan for the Northern Goshawk

Under the NFMA, the Forest Service must ensure the consistency of site-specific projects with approved forest plans. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.15(b); All. for the Wild Rockies v. United States Forest Serv., 899 F.3d 970, 974 (9th

4

Cir. 2018). Project approval documents must describe the project's consistency with the forest plan, which a project may show by conforming to the forest plan's applicable components and conditions. All. for the Wild Rockies, 899 F.3d at 974-75. The Forest Service must amend, modify, or reject projects that fail to conform with the forest plan. 36 C.F.R. § 219.15(c).

In its fourth claim, Conservation Congress argues that the Forest Service violated the NFMA and the APA by failing to demonstrate compliance with the Sierra Nevada Forest Plan Amendment (hereinafter, "Sierra Nevada Amendment") and the Modoc Land and Resource Management Plan (hereinafter, "Modoc Plan") Standards and Guidelines for the Northern Goshawk. Compl. at 29-31. The Northern Goshawk is a species of concern, but is not listed as threatened or endangered by the Endangered Species Act. See Compl. at 12.

Conservation Congress believes that the Project is not in compliance with the Sierra Nevada Amendment and Modoc Plan for four reasons. Compl., ECF No. 1, pp. 29-31. With respect to the Goshawk, Conservation Congress alleges the Forest Service (1) failed to conduct nesting, Protected Activity Center, and habitat surveys pursuant to Amendment Guideline #34 and the Modoc Plan; (2) failed to comply with Sierra Nevada Amendment guidelines by allowing logging in and exceeding the 5-10% logging limitation in Goshawk Protected Activity Centers pursuant to Amendment Guidelines #71, ##76-77, and #81; (3) failed to analyze the percent of the Project mechanically treated in combination with other projects pursuant to Amendment Guidelines #81 and the Modoc Plan; and (4) failed to provide and maintain habitat for

5

100 pairs of Goshawks pursuant to the Modoc Plan. Id.

Central to the present dispute is whether the Sierra Nevada Amendment's Standards and Guidelines apply to the Project. The Sierra Nevada Amendment is a 2004 decision that amends existing forest management plans by establishing management goals, land allocations, desired future conditions, standards and guidelines for management actions, and a strategy to support adaptive management. Admin. R. ("AR") 1098. The Forest Service incorporated the Sierra Nevada Amendment into the 1991 Modoc Plan; however, this incorporation explicitly excluded the Big Valley Sustained-Yield Unit from amendment. Id. According to the Project's Environmental Assessment, the Project is within the North Adin Management Area, within the Big Valley Federal Sustained-Yield Unit. AR 20. The Forest Service argues that any efforts made to comply with the more stringent Sierra Nevada Amendment were voluntary, as the Project needed only comply with the Modoc Plan's standards and guidelines. Opp'n at 2-3.

Even if the Sierra Nevada Amendments govern, the Forest Service argues it has complied with those standards and guidelines. Opp'n at 3. The primary guideline upon which the Forest Service relies is Sierra Nevada Amendment Guideline #16. This guideline allows for salvage harvests in Protected Activity Centers if they have been rendered unsuitable as habitat by a catastrophic "stand replacing" event, in which most of the highest layer of forest vegetation dies due to fire severity. AR 1136. The Project area here includes three Northern Goshawk Protected Activity Centers. AR 20. The Cove Fire rendered two of these centers unsuitable for the bird due to "stand replacing"

6

fire.  AR 253.  The remaining activity center has been unoccupied by Northern Goshawks for the previous six years of surveys.  Id. Under this guideline, performing salvage harvest in severely fire-damaged Protected Activity Centers would not violate the NFMA.

The Court is unpersuaded that Conservation Congress's first argument, that the Forest Service violated Sierra Nevada Amendment Guideline #34, AR 1137, has a likelihood of success. The evidence before the Court shows that the Forest Service complied with the guideline by conducting surveys within the Northern Goshawk's Protected Activity Centers during the Project's planning.  AR 196-97; Johnson Decl., ECF No. 22-3.

Similarly, it appears that the Forest Service has complied with Sierra Nevada Amendment Guideline #71.  AR 1142-43.  The Project's treatment area includes two Protected Activity Centers rendered unsuitable as habitat by the catastrophic Cove Fire and burned areas of another center that has been unoccupied by Northern Goshawks for the past six years.  Guideline #71 does not require that the Forest Service remap the area during project planning, but rather states that protected activity centers "may" be remapped.  Although a 2018 surveyor recommended that the less burned and unoccupied activity center be remapped, Guideline #71 does not require remapping to take place within the timeline sought by Conservation Congress.  AR 197.2.

Conservation Congress's argument that the Forest Service violated Sierra Nevada Amendment Guideline #76 also lacks a likelihood of success.  Guideline #76 prohibits vegetation treatments during Northern Goshawk's breeding season, from

7

February 15 to September 15, unless surveys confirm a lack of nesting. AR 1143. The surveys administered by the Forest Service confirm that Northern Goshawks are not nesting in the Project area. AR 196-97. Guideline 77, AR 1143, which applies when there are occupied nesting sites, is inapplicable.

    2. <u>Fifth Claim: Compliance with the Sierra Nevada Amendment and Modoc Plan for Riparian Areas</u>

 In its fifth claim, Conservation Congress alleges the Forest Service violated NEPA, the NFMA, and the APA by failing to consider impacts to riparian areas and demonstrate compliance with the forest plans. Compl. at 31-35. This claim involves the Project's impact on the Modoc Sucker, a fish delisted from the Endangered Species Act due to recovery. Id. at 12. Conservation Congress argues that the Forest Service did not demonstrate that the Project was consistent with the Modoc Plan and Sierra Nevada Amendment as to the Modoc Sucker and its habitat. Id. at 31-35. Specifically, it alleges that the Project did not demonstrate compliance with the Sierra Nevada Amendment Riparian Conservation Objectives (#2, #4, and #5) and Standards and Guidelines (#102, #103, #105, #111, #112, and #113). Id.

 In a footnote, the Forest Service briefly responds that the Project's documentation complied with NEPA by concluding that the Project will have no effect on the Modoc Sucker. Opp'n at 7 n.1. The Forest Service also argues that the Project will not affect the Sucker's habitat, and thus the fish has no likelihood of irreparable harm from the Project, id. at 11, which Conservation Congress disputes. Reply at 4.

///

8

1  The brief argument against Conservation Congress's fifth
2  claim and the limited analysis regarding the fish in the Project
3  documentation, AR 26, suggest that this claim may have some
4  likelihood of success.

        3.    <u>Seventh Claim: Whether the Forest Service Took a Hard Look at the Project</u>

In its seventh claim, Conservation Congress argues that the Forest Service violated NEPA and the APA by failing to take a hard look at the Project before making a decision. Compl. at 39-42. In its opposition, the Forest Service argues broadly that the Project and its documentation were NEPA-compliant. Opp'n at 6-7.

Again, the Forest Service's arguments against this claim are brief and do not fully address the twelve issues that Conservation Congress believes lacked "hard look" analysis. Opp'n at 6-7. Based on the above arguments, the Court determines that there may be some likelihood of success on the merits on certain issues within this claim.

    B.    <u>Likelihood of Irreparable Harm</u>

Conservation Congress is entitled to injunctive relief only if it demonstrates that substantial and irreparable harm is likely to occur in the absence of an injunction. <u>Winter</u>, 555 U.S. at 22 (reversing the "possibility" standard). "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, <u>i.e.</u>, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." <u>Amoco</u>

9

Prod. Co. v. Vill. of Gambell, AK, 480 U.S. 531, 545 (1987) (concluding denial of a preliminary injunction was proper where injury "was not at all probable").

Conservation Congress argues three theories of why the Project causes irreparable harm and therefore entitles it to injunctive relief: (1) its members will suffer irreparable harm if they are not able to view the Project area recover from fire without disturbance; (2) logging of mature trees constitutes irreparable harm; and (3) NEPA violations constitute irreparable harm. Mot. at 11-15. The Court finds that Conservation Congress has not met its burden of demonstrating that any of these theories constitute harm that is both substantial and probable.

The first theory, premised on member harm, is not persuasive. The declarations submitted by Conservation Congress establish that its members object to logging, generally, but do not establish that substantial harm is a probable result of the Project's continuance. See Boggs Decl., ECF No. 12, pp. 5-6, 8, 11, 14 (stating members' interests are harmed when post-fire habitat is not left undisturbed and when logging occurs in areas around the Northern Goshawk and Modoc Sucker); Lewis Decl., ECF No. 13, pp. 4-6 (stating that the cutting of timber pockets, like those in the Project area, harm his interest in a healthy forest, wildlife, and world); Bevington Decl., ECF No. 14, pp. 4-7 (stating that his enjoyment of the forest would be damaged if logging occurs in post-fire places); Hanson Decl., ECF No. 15, pp. 4-5 (stating that his aesthetic, research, and recreational interests will be harmed by logging in post-fire areas).
///

As similar cases have found, an individual's inability to observe a portion of road-adjacent land during its recovery from wildfire does not constitute an irreparable harm. See, e.g., Earth Island Inst. v. Elliott, 290 F. Supp. 3d 1102, 1124 (E.D. Cal. 2017) (finding the harm of the timber salvage project "to be objectively minimal"); Ctr. for Biological Diversity v. Hays, No. 215-CV-01627 TLN CMK, 2015 WL 5916739, at *10 (E.D. Cal. Oct. 8, 2015) (finding that harm was not irreparable because research could be conducted outside of logging zone); Native Ecosystems Council v. Krueger, No. CV 13-167-M-DLC, 2014 WL 3615775, at *1 (D. Mont. July 21, 2014) (finding that plaintiffs' claims raised only "raise the faintest possibility that they will suffer irreparable harm absent an injunction"). Unlike the plaintiffs in Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127 (9th Cir. 2011), Conservation Congress's members have not shown that the Project will cause its members "actual and irreparable injury." Id. at 1135 (noting injunctions are not warranted by just "any potential environmental injury").

Conservation Congress's second theory of harm also fails. The organization argues that the logging of large, mature trees constitutes an irremediable harm, relying on several Ninth Circuit cases for support. Mot. at 12. Most of these cases are distinguishable because they either addressed the logging of healthy mature trees or they rely on an improper standard of harm. See League of Wilderness Defs. v. Connaughton, 752 F.3d 755 (9th Cir. 2014) (discussing the logging of live mature trees); Neighbors of Cuddy Mountain v. U.S. Forest Service, 137 F.3d 1372, 1382 (9th Cir. 1998) (same); Earth Island Inst. v.

U.S. Forest Serv., 442 F.3d 1147, 1177 (9th Cir. 2006) (relying on the "possibility of irreparable injury" found to be too lenient in Winter, 555 U.S. 7); Am. Trucking Associations, Inc. v. City of Los Angeles, 559 F.3d 1046, 1052 n.10 (9th Cir. 2009) (recognizing that Winter abrogated the "lesser standard" suggested by Lands Council v. Martin, 479 F.3d 636, 643 (9th Cir. 2007)); Earth Island Inst. v. U.S. Forest Serv., 351 F.3d 1291, 1298 (9th Cir. 2003) (utilizing the "possibility of irreparable harm" standard). The post-Winter case involving logging of fire-damaged trees, Cottrell, 632 F.3d at 1135, is also unpersuasive because the panel found that irreparable harm arose from the members' actual inability to utilize the forest for "work and recreational purposes, such as hunting, fishing, hiking, horseback riding, and cross-country skiing," not the logging itself.

Finally, Conservation Congress's third theory of harm is unsuccessful. Conservation Congress makes the broad assertion that "irreparable environmental injury follows from a NEPA violation." Mot. at 14. The Ninth Circuit has recognized that such a presumption does not exist. See Earth Island Inst. v. U.S. Forest Serv., 351 F.3d 1291, 1299 (9th Cir. 2003) ("[T]he Supreme Court has held that insufficient evaluation of environmental impact under NEPA does not create a presumption of irreparable injury."). Assuming irreparable harm results from every alleged NEPA violation would impermissibly relieve plaintiffs of their duty to establish the probability of harm.

As a final point, the Court finds that Conservation Congress has not presented sufficient evidence to demonstrate that the

Northern Goshawk or the Modoc Sucker are likely to suffer a substantial, irreparable harm from the Project. The Forest Service's surveys demonstrated that the Northern Goshawk has not been present in the Project area since the Cove Fire. AR 71-76. Additionally, the Forest Service's scientific information indicates that the Modoc Sucker will not be impacted by the Project due to the trajectory of hydrologic flow. AR 26. The Court defers to the Forest Service's scientific and technical findings unless it is shown that they lack a substantial basis in fact or a rational connection between the facts and determinations made. Arizona Cattle Growers' Ass'n v. Salazar, 606 F.3d 1160, 1163 (9th Cir. 2010). Although Conservation Congress would like the Court to second-guess the Forest Service's findings, the evidence here presents no cause to do so.

Based on the evidence supplied in support of the Motion for Preliminary Injunction, Conservation Congress has not shown a likelihood of substantial and immediate irreparable injury in the absence of an injunction.

    C.   Balance of the Equities and the Public Interest

Prior to awarding a preliminary injunction, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter, 555 U.S. at 24 (quoting Amoco Prod. Co. v. Vill. of Gambell, AK, 480 U.S. 531, 542 (1987)). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Id. (quoting Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982)).

Here, the Project's primary aims are fourfold: (1) recover the economic value of fire-damaged trees before degradation; (2) reduce safety hazards caused by dead trees falling along roads; (3) prepare for future wildfires by reducing fuel loads; and (4) accelerate reforestation by planting site-appropriate trees. AR 23-25. Conservation Congress argues that the public interest is furthered by enjoining the Project to better protect the Northern Goshawk and Modoc Sucker. Mot. at 16.

Several of the Project's aims relate to the promotion of public safety. Hazardous roadside trees that pose a risk of falling within the next five years place forest workers, firefighters, and other travelers at risk. See AR 24, 912. The Forest Service and the public have a strong interest in taking proactive steps to prevent treacherous road conditions caused by fire-killed trees falling on and obstructing public roads. See id.

Additionally, anthropogenic fire suppression and climate change have resulted in more frequent, intense, and severe forest fires. AR 915. The Project aims to deduce the fuel loads that feed forest fires by removing the fire-killed and fire-injured trees and shrubs. AR 24-25. The Forest Service and the public have an interest in mitigating the intensity and severity of future fires, increasing ecosystem resilience. See id.

In sum, the equities and public interest weigh against the issuance of a preliminary injunction.

///

///

///

D. Conclusion

Based on the above analysis, the Court concludes that the Winter factors weigh against granting preliminary injunctive relief.

V. ORDER

Plaintiff's Motion for a Preliminary Injunction is DENIED.

IT IS SO ORDERED.

Dated: October 29, 2018

JOHN A. MENDEZ,
UNITED STATES DISTRICT JUDGE