Rachel Fazio (CA Bar # 187580) Local Counsel
P.O. Box 897
Big Bear City, CA 92314
Tel:  (530) 273-9290
Fax:  (909) 906-1187
rachelmfazio@gmail.com

Elisabeth Holmes (OR Bar # 120254) *Admitted Pro Hac Vice*
Blue River Law, P.C.
P.O. Box 293
Eugene, OR  97440
Tel. (541) 870-7722
eli.blueriverlaw@gmail.com

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSERVATION CONGRESS, a non-profit organization,<br>　　　　Plaintiff,<br><br>vs.<br><br>UNITED STATES FOREST SERVICE,<br>　　　　Defendant. | Case No.: 2:18-cv-02404-JAM-CKD<br>[PROPOSED]<br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*; National Forest Management Act, 16 U.S.C. § 1601 *et seq.*; Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*) |

## STATEMENT OF THE CASE

1.　　Plaintiff is challenging Defendant United States Forest Service's Emergency Situation Determination (ESD), its decision to authorize the Cove Fire Salvage Project ("Cove fire sale" or "the project") Environmental Assessment (EA), Decision Notice (DN), and Finding of No Significant Impact (FONSI) on the Modoc National Forest (Modoc).

2.　　The Forest Service's ESD, EA, and DN/ FONSI for the Cove fire sale are arbitrary and capricious under the Administrative Procedures Act, 5 U.S.C. §§ 701 *et seq.*, and fail to

comply with the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq*.,

and the National Forest Management Act (NFMA), 16 U.S.C. §§ 1601, *et seq.*

## JURISDICTION AND VENUE

3. This court is vested with jurisdiction under 28 U.S.C. § 1331(a) (action for declaratory and injunctive relief arising under the Constitution and laws of the United States); 28 U.S.C. § 2201 and § 2202 (power to issue declaratory or injunctive relief in cases of actual controversy); and 5 U.S.C. §§ 702-706, because (1) the action arises under the laws of the United States, (2) Defendant is sued in its official capacity, and (3) there is a present and actual controversy between the parties.

4. The actions giving rise to this Complaint took place in this District; thus, venue is properly vested in this court pursuant to 28 U.S.C. § 1391(e) and 5 U.S.C. § 703.

5. There exists now between the parties hereto an actual, justiciable controversy.

6. Because the Forest Service granted an ESD, Plaintiff does not have a right of administrative appeal and clearcutting large, merchantable, overstory trees and clearing the ground of small trees and native shrubs will begin immediately.

## PARTIES

7. Plaintiff CONSERVATION CONGRESS (Plaintiff) is a non-profit 501(c)(3) organization incorporated in the state of California, dedicated to maintaining, protecting, and restoring the native ecosystems of Northern California. Plaintiff has an organizational interest in the proper and lawful management of Northern California National Forests, especially the Modoc. Plaintiff's members, staff, and board members participate in a wide range of wildlife viewing, bird watching, and other recreational activities in the Modoc, including in

the project area. The interests of Plaintiff and its members will be irreparably harmed if Defendant continues its violations of law.

8.     Plaintiff has members who live or work in communities located near or adjacent to the Cove fire sale. Its members use and enjoy the Modoc, including the project area, for a variety of purposes including, but not limited to, hiking, backpacking, photography, scientific study, wildlife observation, hunting, and fishing. They intend to continue to do so in the future. Plaintiff's members derive recreational, spiritual, professional, aesthetic, educational, and other benefits and enjoyment from these activities.

9.     The Forest Service's implementation of the project will harm and injure the interest of Plaintiff and its members by causing or threatening irreversible adverse effects to the Modoc, including the project area, and to the wildlife and other objects of interest therein. Defendant's actions would deprive Plaintiff and its members of the recreational, spiritual, professional, aesthetic, educational, and other benefits they presently derive from the Modoc and the project area. Additionally, Defendant's actions deny Plaintiff and its members their right to have laws implemented and enforced, and the satisfaction and peace of mind associated with witnessing the enforcement of this nation's environmental protection laws.

10.    Plaintiff and its members are adversely affected and irreparably injured by the Defendant's impending implementation of the Cove fire sale. These injuries are actual and concrete and would be redressed by the relief sought herein. Plaintiff has no adequate remedy at law.

11.    Defendant UNITED STATES FOREST SERVICE ("Defendant" or "Forest Service") is the agency within the United States Department of Agriculture charged with complying

1   with NEPA, NFMA, the APA, and applicable regulations while making management

2   decisions on National Forests.

3   **FACTUAL BACKGROUND**

4   *The Modoc National Forest, Cove Fire, and Cove Fire Project*

5   12.   The Cove Fire Salvage and Restoration Project is contained within the Big Valley Ranger

6        District of the Modoc National Forest, Northern California, in the Eastern Sierra Nevada

7        mountains. The Cove project area is located approximately 3 miles northwest of Adin,

8        California and is within the North Adin Management Area (MA44), identified in the

9        Modoc National Forest Land and Resource Management Plan. (Modoc LRMP). The

10       Project is within the Big Valley Sustained Yield Unit (BVSYU).

11  13.   The Modoc LRMP contains standards, guidelines, management prescriptions applicable to

12        the project.

13  14.   The EA and the DN/FONSI specifically affirm to a "need" to follow the SNFPA and

14        Modoc LRMP. DN/FONSI at 1. The EA and the DN/FONSI refer to an interdisciplinary

15        team (IDT) that developed the project and that the IDT recognized the "need" to follow the

16        SNFPA and the Modoc LRMP. *Id.*

17  15.   The project's elevation range is between 4,200 feet and 6,378 feet.

18  16.   The project area is 1,380 acres, stretching through Barber Canyon and Dutch Flat Creek

19        areas. The EA does not breakdown the project acreage between Barber Canyon and Dutch

20        Flat Creek areas.

21  17.   Some forested areas of Dutch Flat Creek experienced low or no mortality from the Cove

22        fire. EA at 3 (Figure 2).

FIRST AMENDED COMPLAINT – 4

18.   The project area has three Northern Goshawk Protected Activity Centers (PACs) and associated foraging habitat, habitat for the recently delisted Modoc sucker, is home to several forest sensitive and management indicator species, Riparian Conservation Areas (RCAs), and contains significant acreage of California Wildlife Habitat Relationship (CWHR) of 4M and 4D categories. EA at 47, 49 (Tables 8-11).

19.   Trees within the CWHR category 4 are between 11" to 23.9" in diameter at breast height (DBH). EA at 49 (Tables 10, 11).

20.   CWHR 4M is used to describe stands with canopy cover of 40-59% and CWHR 4D describes denser stands with canopy cover greater than 60%.

21.   The project area and fire perimeter contain very little CWHR 5M and 5D, characterized by trees over 24" DBH (approximately 841 acres), making CWHR categories 4M and 4D the largest and most dense forest categories in the project area. *See* EA at 44 (Table 7).

22.   The Cove Fire started on July 24, 2017 by lightning. As with all fires, it resulted in a mosaic of vegetation burn severity across the entire fire area.

23.   Within two months of the fire burning and before the surviving trees flushed (demonstrating their innate survival strategy response to the fire), the Forest Service used the Rapid Area Assessment of Vegetation Change ("RAVG") process to assess burn severity of the fire.

24.   RAVG mapping is an important initial tool, but it cannot detect flushing, tree size, trees that are scorched but still alive, or distinguish tress that may not be subject to decay.

25.   The Forest Service relied on the RAVG data to support its decision on the Cove fire project.

FIRST AMENDED COMPLAINT – 5

26.   The Forest Service prepared an Environmental Assessment (EA) for a timber sale to clearcut the large, merchantable overstory trees and then subsequently cut the remaining smaller trees and clear native shrubs in a portion of the Cove fire area. The EA contains sections on direct, indirect, and cumulative impacts on wildlife and effects of the project in RCAs.

27.   The Forest Service prepared the EA before assessing and marking whether post-fire trees were "dead" or "dying" based on the Forest Service's *Marking Guidelines for Fire Injured Trees in California* (Report #RO-11-01) (May 2011) ("2011 Marking Guidelines"), or whether trees were "hazard trees" based on the Forest Service's 2011 Marking Guidelines and *Hazard Tree Guidelines for Forest Service Facilities and Roads in the Pacific Southwest Region* Report # RO-12-01 (2012) ("2012 Marking Guidelines").

28.   The Forest Service's EA for the project includes minimum diameter limits for trees or snags subject to salvage logging, but it does not set a cap for maximum size trees or snags the project can remove from the area for salvage.

29.   Pit Resource Conservation District (Pit RCD) has a stewardship contract with the Forest Service, developed for the Cove fire sale, but which also contemplates other projects. Pit RCD was the sole bidder on the Cove fire sale and bid $5,354.25 for the entirety of 6.3 million board feet (MBF) of timber in the Cove project area.

30.   The Forest Service did not advertise the opening of a bidding process or the sale of the Cove fire timber prior to the release of the final NEPA documents to the public.

31.   The Forest Service states that the 6.3MBF of timber "would result in receipts of up to an estimated $630,000." EA at 38-39; *see also* ESD at 2. The Forest Service did not explain

the basis of the estimate or the meaning of "receipts" or of the basis of the $630,000 estimate.

32.  The project must satisfy the Big Valley Federal Sustained Yield Unit (BVFSYU) guidelines, which include significant local milling requirements. *See* Modoc LRMP Chapter 6 App. R (unless an exception applies, "not less than 80 percent of all National Forest sawtimber sold in the Unit must be given primary manufacture within the Big Valley Community" and defining the geographic scope of the Big Valley community). Furthermore, the mills must be "established" mills. *Id*.

33.  Currently Modoc County only has one small, family owned sawmill, and the Forest Service does not indicate what mill will or could handle such a large volume of timber, whether that mill is local, or do more than speculate that new mills may at some point in the future establish themselves. EA at 39.

34.  The Forest Service selected Alternative 1 of only two alternatives. Of relevance, Alternative 1 proposes the following actions and goals: (a) salvage harvest cutting to recover economic value of fire-killed and damaged trees; (b) roadside hazard tree removal to reduce safety hazards caused by the fire along high use roads; (c) fuels treatments to reduce future fuel loads and prepare sites for regeneration; and (d) replanting with non-native trees in an effort to reforest areas damaged by post-fire logging and shrub clearance.

35.  "Salvage" and "roadside" logging, and "fuels reduction" remove vital biodiverse snag forest habitat by cutting trees and clearing the terrain.

   a.  The "salvage harvest" action will cut 982 acres of "fire-killed" and "fire injured" trees. Approximately 305 acres of this cutting would occur within RCAs and

Stream Management Zones (SMZs), and 239 acres (78 percent) of the RCA and SMZ work would be treated using ground-based mechanical equipment. RCA and SMZ designations mean that the project must comply with more stringent standards, notably regarding distance or width from the water where logging can occur, whether mechanical equipment may be used to cut-down or masticate (grind up) trees, and snag retention.

b.  The "roadside hazard tree removal" action will log and remove live and dead trees > 15" DBH along at least two (2) maintenance level 3 roads for a total of 10.5 miles covering up to 398 acres. Felling other non-merchantable trees will also occur. Figure 4 of the EA, however, shows more than two roads within the treatment area. The Transportation Report states that 25.3 road miles are within or provide access the project, and 15 miles are level 3 roads, 7.9 miles are level 2 roads, and 1.1 miles are level 1 roads. Transportation Report at 8. The Forest Service's EA does not disclose all these roads' maintenance levels or explain the difference between these totals.

c.  The "fuels treatment" action will clear the entire 1,380 acre project area of logging slash, and the vast majority of small trees and native shrubs. The EA also authorizes "additional" treatments "as necessary" to meet surface fuel loading objectives. The leftover material would be then chopped up and burnt.

d.  The "reforestation" action will plant up to the entire project area of "moderate to high" vegetation burn with non-native trees.

36. According to the Hydrology Report at 25, App. 3, the project appears to propose salvage and snag culling along nearly every tributary to Dutch Flat Creek on the southwest side, and on nearly every tributary to Barber Creek.

37. The Forest Service's proposed snag retention formula to determine the number of dead trees which should be left in the RCAs and SMZs relies on an average that incorporates inoperable areas. EA at 10, 47.

38. The Forest Service disclosed that within the Cove fire perimeter, other timber removal activities are occurring, but the Forest Service failed to disclose or analyze relevant negative impacts or effects of these actions on the Forest Service's decision. *See* EA at 31.

39. The Modoc sucker was listed as endangered in 1985, delisted in 2014, and is subject to a 2015 Post-Delisting Monitoring Plan (PDMP). Since it was listed as endangered, the Modoc sucker's range has increased, and now includes the Dutch Flat Creek Wildlife Area (PDMP at 2, 7), which is within the project area. The EA says the Wildlife Area will not be treated, but acknowledges the Modoc sucker's habitat is "adjacent" to the project. The EA does not adequately identify or evaluate the project's effects on the Wildlife Area.

40. The Forest Service's analysis of the project's impacts and effects on the Modoc sucker are limited to one footnote. EA at 7, n 4.

41. The Modoc sucker is also a management indicator species in the Modoc LRMP. The Modoc LRMP requires the Forest Service to manage all streams containing the Modoc sucker as directed in the Riparian Area Management Prescription and the Modoc Sucker Recovery Action Plan. Modoc LRMP Forest Wide S&G # 23 Wildlife & Fish (1)(C) at 4-26.

FIRST AMENDED COMPLAINT - 9

42.   A primary threat to the Modoc sucker is habitat degradation from grazing and erosion, including in the Dutch Flat Creek Wildlife Area.

43.   The North Adin Management area supports wildlife habitat for species, including the Modoc Sucker. Modoc LRMP North Adin Management Area Direction at 4-185 to 4-186.

44.   The Modoc LRMP Forest Wide Standards & Guidelines # 15 contains three guidelines for riparian areas (Modoc LRMP at 4-21), including guidelines to:

   a.   Manage riparian areas according to the Riparian Area Management Prescription, and Appendices M (Streamside Management Zones), N (Water Quality and Best Management Practices), and T (Stream Classifications);

   b.   Where uses conflict, favor protection of riparian-dependent resources over other resources;

   c.   Restore degraded riparian areas through structural and non-structural improvements.

45.   The Modoc LRMP Riparian Area Management Prescription (4-135 to 4-145) contains standards and guidelines, including for example:

   a.   Application of Forest-wide S&Gs where specific Riparian Area Management Prescriptions do not exist;

   b.   Facility prescriptions (including impacts from roads, trails, and associated stream crossings);

   c.   Range management prescriptions including excluding livestock;

   d.   Timber harvest prescriptions;

   e.   Water and soil prescriptions; and

FIRST AMENDED COMPLAINT – 10

f.  Wildlife and fish prescriptions.

46.  The Modoc LRMP Appendices relating to riparian areas and water quality and which
contain standards, guidelines, and directives, including Appendix M (Streamside
Management Zones), N (Water Quality and Best Management Practices), and T (Stream
Classifications).

47.  Stream Classifications (Modoc LRMP App. T) inform what other Modoc LRMP S&Gs
apply to a project, and what IDFs are appropriate for a project.

48.  Stream classifications are not identified.

49.  The EA Riparian Conservation Area and Water Quality Protection Measures sought to
comply with the 2004 SNFPA, including in designing the integrated design features of the
project. EA at 16-17 (IDFs implemented to meet SNFPA Riparian Conservation
Objectives).

50.  The Modoc LRMP Appendix S (Range Allotment and Riparian Improvement Priorities)
identifies Dutch Flat Creek as a "Priority 1" stream needing riparian improvement. Modoc
LRMP at S-3. Priority 1 streams have "significant problems that should be corrected in the
1st decade."). Modoc LRMP at S-2.

51.  The EA does not analyze the impacts of grazing on the Modoc sucker, nor does it
adequately identify or analyze the impacts of opening up the project area to increased
grazing.

52.  The Northern Goshawk is protected under the Migratory Bird Treaty Act, 16 U.S.C. § 701
*et seq.* and 50 C.F.R. § 10.12; a species of concern in Executive Order 13186, 66 Fed. Reg.
3853 (Jan. 17, 2001); a forest sensitive species (FSS) under the Modoc LRMP; and a

management indicator species (MIS) in the 2004 Sierra Nevada Forest Plan (as amended) (SFNPA) and the Modoc LRMP EIS § "Affected Environment" at 3-102 ("Because its presence indicates the availability and condition of older forest ecosystems, the goshawk was selected as Forest management indicator species.") The Forest Service's Northern Goshawk Inventory & Monitoring Technical Guide (Gen. Tech. Report WO-71) (July 2006) states that the Northern Goshawk is FSS and MIS, resulting in a need for information on status, habitat, and population trends throughout its range.

53.   The Forest Service's EA treats the Northern Goshawk as a sensitive species (EA at 52) but does not treat the Northern Goshawk as a MIS. *See* EA at 43-44; Management Indicator Report.

54.   Most of the Northern Goshawks found on the Big Valley Ranger District are born and raised in the North Adin Management Area. Modoc LRMP Ch. 4, North Adin S&G at 4-185.

55.   The EA contains incorporated integrated design features (IDFs) that are resource protection measures "incorporated as part of the Proposed Action for this project. They are ***in addition to*** Best Management Practices (BMPs) and Standards and Guidelines from the Modoc LRMP, as amended." EA at 15 (emphasis added). For all IDFs, the DN/FONSI refers to the EA. DN/FONSI at 8 ("Integrated Design Features See Cove EA pages 15-20").

56.   For the Northern Goshawk, the EA "incorporated into the proposed action" IDFs # 41-44. EA at 19-20. The EA states these IDFs are "consistent with Standards and Guidelines identified in the SNFPA ROD (2004)." *Id.*

57.   IDFs # 41 - 44 incorporated into the project emphasize, in summary, the use of nest, PAC, and habitat surveys to inform project activities, to establish or confirm nest or activity center locations, to review PAC boundaries and make adjustments, to maintain PACs regardless of occupancy status unless surveys conducted to protocol in remaining suitable habitat following stand-replacing events confirm non-occupancy, follow limited operating periods (LOPs), and to conduct surveys "during the planning process" when activities are likely to reduce habitat quality. EA at 19-20 (IDFs # 41 – 44).

58.   The Forest Service's EA and DN/FONSI determined to authorize the project here, and that "future analysis" and "future surveys" would determine PAC status and goshawk presence, and the PACs will be dropped or re-mapped at a later date. EA at 52-53.

59.   There are three Northern Goshawk protected activity centers (PACs) within the project area. BE/BA at 59, Appendix 1.

60.   The BE/BA acknowledges that in the project area, "potential habitat may still be present to provide nesting opportunities." BE/BA at 17.

61.   The Forest Service then concluded that despite the cutting, clearing, reducing, and removal of snag habitat, the project would not have a significant effect on the Northern Goshawk.

62.   The Forest Service acknowledged that snag and downed wood would give Northern Goshawks increases in prey, but simultaneously noted that habitat type would be removed by the project. EA at 53.

63.   The Forest Service concluded that displacement of Northern Goshawks would be short-term and that there is "suitable goshawk habitat outside the burned perimeter and within

deferred areas within the fire perimeter." EA at 55. The Forest Service did not provide information on Northern Goshawk habitat or PACs in areas outside of the project area.

64.    The Forest Service concluded that displacement of Northern Goshawks foraging in the project area "until project actions…are completed" was not a significant impact. EA at 55. The Forest Service did not identify when the project actions will be completed.

65.    The Modoc LRMP has standards, guidelines, and objectives applicable to the Northern Goshawk. For example, the Forest Service is required to provide and maintain habitat for 100 pairs (nest territories) of goshawks of at least medium habitat capability. Modoc LRMP Forest Wide S&G 4-26(D)(23)(2)(A) and Objective 4-12. In the Modoc, this includes a density of at least 1 Northern Goshawk territory per 18 square miles with not greater than 12 miles distance in between territories. Modoc LRMP Forest Management Prescription at 4-91.

66.    Where specific Raptor Management Prescriptions do not exist, the Forest Service is to use Forest-wide S&Gs.

67.    The Modoc LRMP Raptor Management Prescription S&Gs (Modoc LRMP at 4-85 to 4-91) contain requirements specific to Northern Goshawk habitat, for example:

    a.    Discourage nests being located in areas of timber activity. Modoc LRMP at 4-91(2)(G);

    b.    Require LOPs and buffer distances of at least 100 acres or 50 acres around a nest stand and an alternate nest stand. Modoc LRMP Raptor Management Prescription at 4-91(1)(G);

c.   Encourage the enhancement of prey-based habitats for the Northern Goshawk within two miles of nest stands. Modoc LRMP at 4-91;

d.   Limit road use and construction. Modoc LRMP Raptor Management Prescription at 4-86.

68.   The Dutch Flat Creek PAC still has approximately 100 acres of green trees. The Forest Service noted the trees may not die in 2018, and although the PAC has not been occupied during the last six years of surveys "potential habitat may still be present to provide nesting opportunities." EA at 53-54.

69.   The Modoc LRMP indicates a strong association between Northern Goshawk PACs and old growth forests. *See, e.g.*, Modoc LRMP EIS § Alternatives at 2-4 (harvesting eastside pine and mixed conifer jeopardizes Northern Goshawk and other old-growth dependent wildlife species); 2-14; § Affected Environment 3-102.

70.   The Modoc LRMP EIS states that "Although enough suitable habitat is available, the amount of medium to high capability habitat for the goshawk is reduced by clearcutting… reductions in the acreage of old growth and mature conifer stands may preclude meeting this (100 active nest territories) goal, especially on the Big Valley and Doublehead Ranger Districts where the minimum number of territories are not yet designated." Modoc LRMP EIS "Environmental Consequences" at 4-77.

71.   From the BE/BA map showing three PACs and the treatment areas (BE/BA at 59, Appendix 1), and from the Forest Service map of the treatment areas (EA at 11, Figure 3), it appears that the Forest Service will allow logging in Northern Goshawk PACs in implementing the project.

72. The Forest Service is obligated to consider other FSS and MIS species, for example the black-backed woodpecker, fringed myotis bats, and pallid bats.

73. Black-backed woodpeckers immediately begin using areas immediately after a fire burns, unlike the other species that utilize post-fire habitats for nesting, denning, and foraging 2 to 20 years post-fire. The Forest Service's EA noted that the species is "strongly associated" with burned forests during the first eight years following a fire, and it prefers medium and large snags like those found in the CWHR 4M and 4D habitat categories targeted for removal in the Cove fire sale. EA at 77.

74. The Forest Service disclosed that it observed a black-backed woodpecker post-fire, foraging on a 24" DBH fire-killed Ponderosa pine along Dutch Flat Road. EA at 78.

75. The Forest Service recognized that post-fire habitat is also positive for the fringed myotis and pallid bats who use large tree cavities, forage in woodlands where open areas with flowers and shrubs are interspersed with mature forest all of which are present in fire-created snag habitat which provides high quality roosting and foraging sites. EA at 62.

76. The Modoc LRMP does not automatically provide for the minimum needs of all other forest species therefore sometimes it is necessary to manage special habitat for non-indicator species at the project level. Modoc LRMP Forest Wide S&G # 23 at 4-25 to 4-26.

77. The Modoc LRMP North Adin Management Area Direction "Wildlife and Fish" S&G contains a multi-prong instruction to the Forest Service. This S&G requires, in summary, the Forest Service to designate old growth, increase snag densities and use snag surveys, fence for nongame species, maintain or improve oak densities, improve Modoc sucker habitat in three creeks (including Dutch Flat Creek), identify opportunities for blue grouse,

implement habitat needs for pileated woodpecker, and inventory and protect active goshawk nest territories when necessary to meet population targets." Modoc LRMP Ch. 4, North Adin S&G at 4-186.

78. The Forest Service is to overlay pileated woodpecker territories with other old-growth management indicator species (e.g. goshawk) where possible. Modoc LRMP Forest Wide S&G at 4-12.

79. The Forest Service acknowledged that implementation of Alternative 1's salvage logging will open the forest canopy, increase light to the ground and increase understory vegetation (EA at 32), and thus increase forage available for livestock grazing within the National Forest, as well as increase livestock distribution throughout the project area. The Forest Service concluded that increased grazing is a cumulative effect that will "maintain or improve" the range forage resources by reducing invasive plants and maintaining a more open forest canopy, and it will be a net long-term improvement to range forage resources. *See* EA at 32-33, 35, 74.

**PROCEDURAL FACTS**

80. On February 8, 2018 the Forest Service issued a Notice of the Proposed Action and the Purpose, Need and Proposed Action, initiating the scoping process for the Cove fire sale and giving the public 30 days to comment. The Forest Service did not post the scoping letter on its website until nearly a month later, on March 1, 2018. The Forest Service briefly extended the comment deadline and on March 12, 2018 Conservation Congress submitted comments on the Cove fire sale to the Modoc National Forest.

81.  On April 26, 2018, the Forest Service issued a Draft Environmental Assessment and a request for public comments on the Cove fire sale. On May 29, 2018, Conservation Congress submitted comments on the Cove fire sale, incorporating its March 12, 2018 comments.

82.  On June 9, 2018, the Forest Supervisor, Modoc National Forest, signed a Decision Notice and Finding of No Significant Impact for the Cove Fire Salvage Project ("DN/FONSI"). The DN/FONSI states that "[i]mplementation of the decision may begin immediately upon the signing of the decision."

83.  The DN/FONSI was not issued to the public at that time.

84.  In June 2018, the Forest Service prepared a Final EA on the project. The Final EA was not issued to the public at that time.

85.  Prior to issuing the Final EA to the public, on July 5, 2018, Defendant Forest Service advertised the Cove fire sale in the Modoc County Record, but the Forest Service withdrew the advertisement.

86.  On July 12, 2018 the Forest Service Chief signed an ESD allowing project implementation to begin immediately after publication of the DN/FONSI legal notice. The DN/FONSI was not publicly noticed at that time.

87.  On July 20, 2018 the Forest Service sold 1,380 acres of timber to Pit RCD, the sole bidder. The contract runs through March 31, 2020.

88.  On July 26, 2018, approximately 7 weeks after the final decision had been made, the Forest Service posted the ESD, EA, and DN/FONSI on its website. On the same day, the Forest

Service signed a timber sale contract, selling 6.3MBF of timber for less than appraised value.

89.   The Forest Service did not provide Conservation Congress with notice of the ESD, DN/FONSI, or Final EA in June 2018, or on July 12 or on July 26, 2018.

90.   On July 31, 2018 during an online search, Conservation Congress happened to find these documents posted on the Modoc National Forest website. Conservation Congress contacted the Forest Service several times between July 31 and August 13, 2018 via email regarding the lack of notice to the public, and seeking project implementation, advertising, bid announcements, notice of sale, and seller information. On August 1, 2018, Defendant Forest Service responded that the project was being implemented through a stewardship agreement with Pit RCD.

91.   On August 13, 2018 at 2:22 p.m., over two months after the final decision had been made, the Forest Service emailed the ESD, Final EA, and the DN/FONSI to Conservation Congress.

92.   Upon Conservation Congress's information and belief, the public notice of the EA, DN/FONSI, ESD, and sale has yet to be published in the local newspaper.

## GENERAL STATUTORY FRAMEWORK

**The National Environmental Policy Act**

93.   The National Environmental Policy Act (NEPA) is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Congress enacted NEPA in 1969, directing all federal agencies to assess the environmental impact of the proposed actions that significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C). NEPA's

primary goals are to ensure fully informed decision-making and to provide for public

participation in environmental analyses and decision-making. 40 C.F.R. § 1500.1(b), (c).

Council on Environmental Quality (CEQ) regulations implementing NEPA are binding on

all federal agencies. 40 C.F.R. §§ 1500 *et seq.*

94.   Public participation in the decision-making process, public scrutiny of the project, public

notice of the decision, and the public's right to seek redress of improper decisions are key

components of NEPA. 42 U.S.C. §§ 4331 - 4332; 40 C.F.R. § 1500.1(b); 40 C.F.R. §

1500.2; 5 U.S.C. § 702.

95.   NEPA is a procedural statute that requires agencies to take a "hard look" at the

environmental consequences of its actions.

96.   NEPA also requires that agencies adequately consider and disclose direct and indirect

impacts of a project (40 C.F.R. § 1508.7), and cumulative effects (40 C.F.R. § 1508.8).

Cumulative effects result from the incremental impact of the proposed action when added

to other past, present, and reasonably foreseeable future actions. 40 C.F.R. § 1508.25(a).

97.   NEPA requires agencies discuss mitigation measures for environmental impacts of a

project. Where an agency prepares an environmental assessment and it discusses possible

mitigation measures, an agency must provide a reasonably complete discussion of such

measures.

98.   Based on the information provided in the EA, the decision maker must determine whether

or not the project will have a significant impact on the environment. If the decision-maker

makes a finding of no significant impact (FONSI), it is it the decision-maker's burden to

support the FONSI with evidence from the EA.

**Emergency Situation Determinations**

99. An Emergency Situation Determination ("ESD") administratively allows for a project to proceed "immediately" upon agency approval. ESDs need not comply with pre-decisional objection procedures, and the public does not have a right of administrative appeal. 36 C.F.R. § 220.7(d). Any ESD objections must be filed with the court. 36 C.F.R. § 218.21(c), (d).

100. ESDs may only be used when "immediate implementation of a decision is necessary to achieve one or more of the following: Relief from hazards threatening human health and safety; mitigation of threats to natural resources on NFS or adjacent lands; avoiding a loss of commodity value sufficient to jeopardize the agency's ability to accomplish project objectives directly related to resource protection or restoration." 36 C.F.R. § 218.21(b).

101. Even though ESD implementation may begin "immediately", the Forest Service must still notify the public of an ESD Decision Notice. "The responsible official shall notify interested and affected parties of the availability of the EA, FONSI and decision notice, as soon as practicable after the decision notice is signed." 36 C.F.R. § 220.7(d).

**The National Forest Management Act**

102. The National Forest Management Act (NFMA) requires that the Forest Service carry out activities on national forest lands "consistent with the land management plans." 16 U.S.C. §1604(i). Pursuant to NFMA, the Sierra Nevada National Forest developed a management plan.

103. The 1991 Modoc Land and Resources Management Plan sets forth standards and guidelines and resource conservation objectives which apply to the project. Each site-

specific project on the Modoc National Forest, including the Cove fire sale, must comply with the applicable forest plans, and their standards and conservation objectives. Additionally, the Modoc LRMP contains Standards and Guidelines for the North Adin Management Area.

104.   The 2004 Sierra Nevada Forest Plan Amendment was incorporated into the Modoc LRMP.

105.   The Forest Service's EA and DN/FONSI relied on the 2004 SNFPA in making its decision. See DN/FONSI at 1, 6; EA at 4 (Purpose and Need for the Proposal), 16-17 (Riparian Conservation Areas and Water Quality Measures), 19 (Soil Quality Standards and Best Management Practices), 19-20 (Threatened, Endangered, and Sensitive (TES) Wildlife Species).

106.   NFMA forbids the Forest Service from selling trees below market value. 16 U.S.C. 472a(a).

**The Administrative Procedure Act**

107.   The Administrative Procedure Act (APA) provides for judicial relief of final agency action. 5 U.S.C. §§ 701, 706.

108.   Under the authority of the APA, a reviewing court must hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2).

**FIRST CLAIM FOR RELIEF**

**Violations of NEPA and the APA**

**Failure to Publish Legal Notice of Environmental Assessment, and Decision Notice/FONSI Prior to Advertising and Effectuating Sale**

109.   Plaintiff incorporates by reference the preceding paragraphs.

110.   NEPA requires public participation in the decision-making process, public scrutiny of the project, public notice of the decision. 42 U.S.C. § 4331(a).

111.   Emergency situations requiring prompt removal of timber require formal advertising, and such advertising may not be authorized for less than seven (7) days. 36 C.F.R. § 223.81.

112.   Notice of advertising must be made available to the public. 36 C.F.R. § 223.82.

113.   In stewardship contracts, timber sale contracts must be advertised for at least 30 days. 36 C.F.R. § 223.302 and § 223.80.

114.   Defendant failed to properly notify the public of the EA, DN/FONSI, and Cove fire bidding and sale.

115.   For the foregoing reasons, the Forest Service failed to demonstrate that the project is consistent with NEPA and the APA.

116.   Defendant's actions as described above are arbitrary, capricious, not in accordance with law, and without observance of procedures required by law, within the meaning of the APA, 5 U.S.C. § 706.

117.   Plaintiff is entitled to its reasonable fees, costs, and expenses associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

**SECOND CLAIM FOR RELIEF**

**Forest Service Violation of 36 C.F.R. § 220.7(d) and APA**

**ESD Notice Was Illegally Withheld**

118.   Plaintiff incorporates by reference the preceding paragraphs.

119.   ESDs are not subject to administrative review, and implementation of an ESD may begin "immediately" after notice. 36 C.F.R. § 218.21(c)(1), (d)(1).

120. Notification requirements state that the agency "shall notify interested and affected parties of the availability of the EA, FONSI and decision notice as soon as practicable after the decision notice is signed." 36 C.F.R. § 220.7(d).

121. Under non-emergency situation determination matters, notice of environmental assessments documents must be provided "upon distribution" and are to be posted on the internet within four (4) calendar days. 36 C.F.R. § 218.7(b)-(d).

122. The ESD was signed on July 12, 2018.

123. The ESD was posted on the Modoc Forest Service website on July 26, 2018.

124. The Forest Service emailed the ESD, DN/FONSI, and EA to Conservation Congress on August 13, 2018.

125. Defendant failed to notify the public of the ESD "as soon as practicable after the decision notice is signed."

126. For the foregoing reasons, the Forest Service failed to demonstrate that the project is consistent with 36 C.F.R. § 220.7(d) the APA.

127. Defendant's actions as described above are arbitrary, capricious, not in accordance with law, and without observance of procedures required by law, within the meaning of the APA, 5 U.S.C. § 706.

128. Plaintiff is entitled to its reasonable fees, costs, and expenses associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

**THIRD CLAIM FOR RELIEF**

**Forest Service Violation of 36 C.F.R. § 218.21 and the APA**

**ESD Criteria Are Not Satisfied**

129.   Plaintiff incorporates by reference the preceding paragraphs.

130.   Forest Service regulations define an ESD as "A situation on National Forest System (NFS) lands for which immediate implementation of a decision is necessary to achieve one or more of the following: Relief from hazards threatening human health and safety; mitigation of threats to natural resources on NFS or adjacent lands; avoiding a loss of commodity value sufficient to jeopardize the agency's ability to accomplish project objectives directly related to resource protection or restoration." 36 C.F.R. § 218.21(b).

131.   An ESD shall be based on an examination of the relevant information. 36 C.F.R. § 218.21(c).

132.   Defendant failed to adequately examine one or more pieces of relevant information relating to safety and economic justifications for the ESD, rendering its ESD unlawful, namely:

   a.   Hazard threats from trees by failing to examine tree stability, health, and survival post-fire pursuant to Forest Service Hazard Tree guidelines;

   b.   Hazard threats to humans by failing to identify road maintenance level classifications within the project area;

   c.   True commodity value;

   d.   Mitigation of threats to FSS and MIS.

133.   For the foregoing reasons, the Forest Service failed to demonstrate that the project is consistent with 36 C.F.R. § 218.21.

134.   Defendant's actions as described above are arbitrary, capricious, not in accordance with law, and without observance of procedures required by law, within the meaning of the APA, 5 U.S.C. § 706.

135. Plaintiff is entitled to its reasonable fees, costs, and expenses associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

## FOURTH CLAIM FOR RELIEF

### Forest Service Violated NFMA and the APA

#### Forest Service Failed to Demonstrate Compliance with the Modoc LRMP Standards & Guidelines for the Northern Goshawk, and SNFPA Standards it Adopted

136. NFMA requires that all projects comply with the relevant forest plan. 16 U.S.C. § 1604(i).

137. The Modoc LRMP applies to the Modoc National Forest, and contains standards, guidelines, prescriptions, objectives, and directives for activities relating to the Northern Goshawk.

138. The Forest Service's decision contains integrated design features that it stated are "consistent" with the SNFPA.

139. The Forest Service relied on the SNFPA in reaching its decision.

140. The Forest Service's decision violates NFMA by implementing the project without full compliance with Modoc LRMP S&Gs and Objectives including:

    a.  Failure to demonstrate compliance with the Modoc LRMP and its Forest-Wide Guidelines and Raptor Management Prescription S&Gs;

    b.  Failure to demonstrate timber activity is not located in nest areas (Modoc LRMP at 4-91(2)(G));

    c.  Failure to demonstrate LOP and buffer distance compliance (Modoc LRMP at 4-91(1)(G));

    d.  Failure to demonstrate enhancement of prey-based habitat within two miles of nest stands (Modoc LRMP at 4-91);

1        e.   Failure to demonstrate limited road use and construction (Modoc LRMP at 4-91);

2        f.   Failure to adequately demonstrate compliance with Modoc LRMP Forest Wide

3             S&G 4-26(D)(23)(A) (100 pairs in at least medium habitat);

4        g.   Failure to disclose where landings would be built in Northern Goshawk habitat,

5             including the 100 acres of green trees in the Dutch Flat PAC.

6   141.   The Forest Service failed to provide sufficient evidence that its decision does not violate

7          NFMA.

8   142.   For the foregoing reasons, the Forest Service failed to demonstrate that the project is

10         consistent with NFMA, the applicable forest plans, forest plans it relied on, and the APA.

11  143.   Defendant's actions as described above are arbitrary, capricious, not in accordance with

12         law, and without observance of procedures required by law, within the meaning of the

13         APA, 5 U.S.C. § 706.

14  144.   Plaintiff is entitled to its reasonable fees, costs, and expenses associated with this litigation

15         pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

17                              **FIFTH CLAIM FOR RELIEF**

18                  **Forest Service Violation of NEPA, NFMA, and the APA**

19  **Forest Service Failed to Adequately Disclose and Consider Impacts to Riparian Areas
    and the Modoc Sucker, and Failed to Demonstrate Compliance with the Modoc
20  LRMP and the SNFPA Standards it Adopted for Riparian Areas and the Modoc
                                    Sucker**

22  145.   Plaintiff incorporates by reference the preceding paragraphs.

23  146.   NFMA requires that all projects comply with the relevant forest plan. 16 U.S.C. § 1604(i).

24  147.   The Modoc LRMP applies to the Modoc National Forest, and contains standards,

25         guidelines, prescriptions, objectives, and directives for activities in riparian areas.

148. The Forest Service failed to demonstrate that its proposal to log within SMZs complies with the Modoc LRMP requirement to maintain or improve riparian dependent resources. Modoc LRMP Riparian Management Prescription at 4-135; App. M.

149. The Forest Service failed to identify the project's stream classifications. Modoc LRMP App. M (Streamside Management Zones). Stream classification is necessary to implement the Modoc LRMP Riparian Area Management Prescription. Modoc LRMP App. T (Stream Classification for Implementing the Riparian Area Management Prescription). Stream classification is necessary to assess how the Forest Service's activities and IDFs are appropriate for the stream classifications and what other Modoc LRMP S&Gs apply.

150. The Forest Service does not adequately disclose and consider seasonal streams within the project area, hydrologic connections to Dutch Flat Creek, and the impacts of the project on these features.

151. The EA fails to adequately disclose or consider the impact of extreme rain events and peak snowmelt on the water quality of waters downstream from seasonal streams.

152. The Forest Service does not adequately disclose the location of RCAs and SMZs, and other aquatic features, within the project area.

153. The Forest Service does not demonstrate that the project will comply with the Timber Guidelines for riparian areas. Modoc LRMP Riparian Management Prescription at 4-140 to 4-141.

154. The Forest Service does not disclose how it will determine which trees to cut in the RCA and SMZs.

155.   The EA does not disclose the location of the Modoc sucker's habitat in the Dutch Flat
Creek Wildlife Area, impacts to the area from treatment activities or that project impacts
may occur upstream from the Modoc sucker habitat or adjacent to the Modoc sucker
habitat.

156.   The Forest Service does not adequately disclose and consider that the project will increase
access of livestock to RCAs and streams within the project area, the impacts livestock will
have on the riparian and stream areas, or Modoc LRMP compliance for Priority 1 stream
protections from grazing. Modoc LRMP Riparian Management Prescription at 4-138 to 4-
139, 4-145.

157.   The Forest Service does not demonstrate compliance with broader aquatic riparian meadow
and ecosystem strategy. Modoc LRMP Riparian Management Prescription at 4-140 and EA
at 17.

158.   The Forest Service does not adequately consider the impacts of mechanical and non-
mechanical treatment in RCAs and on waters within the project area.

159.   The Forest Service does not adequately consider the impacts of the portions of the project
that would allow prescribed fire and fire from pile burning to spread into RCAs or special
aquatic features.

160.   The EA allows the use of existing landings within RCAs, yet the EA fails to adequately
disclose or consider whether the use of existing landings within RCAs or their expansion,
complies with the Modoc LRMP or with the project's IDFs.

161.  The EA fails to adequately disclose or consider the direct, indirect, and cumulative effects of the proposed action on seasonal streams, downstream waters, and aquatic and riparian dependent species including the Modoc sucker.

162.  By failing to adequately disclose and consider the impacts of the proposed project on physical and biological characteristics of riparian areas and the effect of the project on aquatic and riparian dependent species, the Forest Service violated NEPA and fails to demonstrate compliance with the Modoc LRMP, and the SNFPA standards adopted by the project, which violates NFMA and NEPA.

163.  For the foregoing reasons, the Forest Service failed to demonstrate that the project is consistent with NFMA, the applicable forest plan, NEPA, and the APA.

164.  Defendant's actions as described above are arbitrary, capricious, not in accordance with law, and without observance of procedures required by law, within the meaning of the APA, 5 U.S.C. § 706.

165.  Plaintiff is entitled to its reasonable fees, costs, and expenses associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

**SIXTH CLAIM FOR RELIEF**

**Forest Service Violation of NEPA, NFMA, and the APA**

**Forest Service Failed to Adequately Disclose and Consider Modoc LRMP Standards and Guidelines Regarding Snag Density and Snag Diameter**

166.  Plaintiff incorporates by reference the preceding paragraphs.

167.  The Forest Service failed to disclose whether and how the project complies with the Modoc LRMP S&G snag diameter and snag density requirements.

168. The EA sets the minimum snags per acre that the project will retain by referring to the largest representative diameter size class averaged across the unit.

169. The EA incorporates large snags retained within RCAs and inoperable areas into its average snag density calculation.

170. The Modoc LRMP S&Gs for snags require the Forest Service to "[p]rovide habitat conditions for viable populations of snag-dependent species by meeting the snag requirement targets" provided in the Modoc LRMP Ch. 4 at 4-30.

171. The Modoc LRMP Forest Wide S&Gs (at 4-30 to 4-31) snag standards include:

    a. "Clumped dispersion of snags is desired, but no more than five snags per acre may be counted for determining average snag densities."

    b. Twenty feet is the minimum height for snags.

    c. "On poorly stocked stands with too few trees to meet snag requirements, reserve green, dead, and dying trees."

    d. On "Suitable timber lands," the average snag density requirement for snags greater than 24" DBH, is 0.3 snags/acre.

    e. On "Low Productivity Timberlands," the average snag density requirement for snags greater than 24" DBH is 0.5 snags/acre.

    f. Green and salvage sales will provide for snag recruitment by designation, leaving an adequate number of living and dead trees for future snags.

    g. Snag recruitment trees will be signed or otherwise designated, as on appraisal maps and stand record cards.

172. The Forest Service fails to disclose necessary information to determine its compliance with the Modoc LRMP, or to disclose why its project proposes different snag standards.

173. The Forest Service fails to disclose or consider whether Modoc LRMP S&Gs for the North Adin Management Area (MA44) (Ch. 4 at S&G 4-185) currently meet the standards and guidelines for the management area, which include, among others, the following S&Gs:

   a.   Designate 1,325 acres of old growth in mixed conifer and 850 acres in eastside pine;

   b.   Improve Modoc Sucker habitat in Dutch Flat Creek and improve trout habitat in upper Ash Creek; and

   c.   Inventory and protect active goshawk nest territories necessary to meet population targets.

174. The project failed to adequately demonstrate compliance with Modoc LRMP monitoring and evaluation requirements, including Table 5-1, to mitigate the impacts of the clearing and cutting work on the project area;

175. The Forest Service violates NFMA and NEPA by failing to demonstrate compliance with the Modoc LRMP and the North Adin Management Area S&Gs.

176. For the foregoing reasons, the Forest Service failed to demonstrate that the project is consistent with NFMA, the applicable forest plans, NEPA, and the APA.

177. Defendant's actions as described above are arbitrary, capricious, not in accordance with law, and without observance of procedures required by law, within the meaning of the APA, 5 U.S.C. § 706.

Plaintiff is entitled to its reasonable fees, costs, and expenses associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

### SEVENTH CLAIM FOR RELIEF

### Forest Service Violation of NEPA and the APA

### Forest Service Failed to take a Hard Look at the Cove Fire Sale Project

178. Plaintiff incorporates by reference all preceding paragraphs.

179. NEPA requires federal agencies to analyze the foreseeable environmental impacts, including direct and indirect effects, and cumulative impacts, of "major federal actions." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.8 (effects); 40 C.F.R. § 1508.7 (cumulative impacts).

180. Direct effects are caused by the action and occur at the same time and place as the action. 40 C.F.R. § 1508.8(a). Indirect effects are caused by the action and occur later in time or are farther removed in distance but are still reasonably foreseeable. 40 C.F.R. § 1508.8(b). Cumulative effects result from the incremental impact of the action when added to other past, present, and reasonably foreseeable actions. 40 C.F.R. § 1508.25(a).

181. A federal timber sale is a major federal action as defined by NEPA.

182. An EA must "provide sufficient evidence and analysis for determining whether" the project will have a significant impact on the environment. 40 C.F.R. § 1508.9(a)(1).

183. An agency must take a "hard look" at a project before a decision is made.

184. In the Cove firesale, the Forest Service failed to adequately disclose and analyze the project's direct and indirect impacts and cumulative effects.

185. The Forest Service failed to disclose and conduct a hard look analysis with respect to the following issues:

    a. Economic justifications for the project;

    b. The direct, indirect, and cumulative impacts of using 2017 RAVG data;

    c. The direct, indirect, and cumulative impacts of failing to adequately implement the 2011 and 2012 Marking and Hazard Tree Guidelines prior to reaching a decision on the project, and possibly before implementing the project;

    d. Direct, indirect, and cumulative effects of the project on the Modoc sucker and its habitat;

    e. Direct and indirect effects and cumulative impacts of the project on the Northern Goshawk's nesting, foraging, PAC use, and habitat in the project area and in areas relevant through guidelines;

    f. Disclosure and analysis of direct and indirect effects and cumulative impacts of the project on the post-fire habitat of the forest for FSS and MIS species such as the black-backed woodpecker and bats;

    g. Direct and indirect effects of the project on riparian areas;

    h. Direct and indirect effects of water withdrawal and water use of the project from the Dutch Flat Creek for dust abatement during project implementation;

    i. Indirect and cumulative effects of livestock grazing and expansion in the project area, particularly effects on FSS, MIS, and in riparian areas;

    j. Disclosure of road maintenance level classifications for all roads in the project area;

    k. Impacts and effects of road construction; and

FIRST AMENDED COMPLAINT – 34

l.   Cumulative impacts of other timber sales occurring around, adjacent to, and in close proximity to the project area, how these relate to the Forest Service's decision.

186.   For the foregoing reasons, the Forest Service failed to demonstrate that the project is consistent with NEPA and the APA.

187.   Defendant's actions as described above are arbitrary, capricious, not in accordance with law, and without observance of procedures required by law, within the meaning of the APA, 5 U.S.C. § 706.

188.   Accordingly, the decision to proceed should be set aside, and the project should be enjoined until Defendant prepares a NEPA document that includes adequate direct and indirect impacts, and cumulative effects, analyses.

189.   Plaintiff is entitled to its reasonable fees, costs, and expenses associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

### EIGHTH CLAIM FOR RELIEF

### Violation of NFMA, NEPA, and the APA

### Failure to Assess and Mark Each Fire-Injured and Hazard Tree Pursuant to Guidelines

190.   Plaintiff incorporates by reference the preceding paragraphs.

191.   NFMA requires that all projects comply with the relevant forest plan. 16 U.S.C. § 1604(i).

192.   NEPA requires agencies to justify their decisions, to rely on accurate scientific analysis, and to make decisions that protect, restore, and enhance the environment. 42 U.S.C. § 4332; 40 C.F.R. § 1500.1.

193.   The Modoc LRMP Timber Management Direction guidelines only allow for trees destroyed by fire to be harvested if they are in stands 5 acres or larger, and if 75% of the standing trees have been killed. Modoc LRMP at 4-63.

194.   Without assessing whether the trees meet the 2011 Fire Injured Tree or the 2012 Hazard Tree Guidelines, the Forest Service cannot reasonably comply with the Modoc LRMP, NEPA, or the APA.

195.   The 2011 Fire Injured Tree Guidelines and the 2012 Hazard Tree Guidelines require the Forest Service to visually assess and mark each tree that may be felled under the Guidelines, and to complete a form for each tree that meets the 2012 Guidelines.

196.   APA requires agencies to follow their own rules, guidelines, and procedures and failure to do so may be unlawful. 5 U.S.C. § 706

197.   Defendant failed to assess and mark each tree for felling under the Guidelines, and to do so before implementing the project.

198.   Defendant failed to complete the 2012 Guideline forms for each hazard tree.

199.   For the foregoing reasons, the Forest Service failed to demonstrate that the project is consistent with NEPA and the APA.

200.   Defendant's actions as described above are arbitrary, capricious, not in accordance with law, and without observance of procedures required by law, within the meaning of the APA, 5 U.S.C. § 706.

201.   Plaintiff is entitled to its reasonable fees, costs, and expenses associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

### NINTH CLAIM FOR RELIEF

**Violations of NFMA, NEPA, APA, and Forest Service Regulations**

**Failure to Disclose Timber Sale Appraisal and Failure to Sell the Timber at Not Less Than Appraised Value**

202.   Plaintiff incorporates by reference the preceding paragraphs.

203.   NFMA requires the Forest Service to sell National Forest resources at not less than the appraised value. 16 U.S.C. § 472a(a).

204.   The Modoc LRMP, Big Valley Federal Sustained Yield Unit Policy (Chapter 6, Appendix R) requires National Forest sawtimber to be offered on a competitive basis and "standard Forest Service appraisal methods will be used in arriving at advertised rates." Id. The policy also requires consideration of "established" sawmills and their total capacity. Id.

205.   NEPA requires the government to foster and promote economic requirements of present and future generations of Americans. 42 U.S.C. § 4331.

206.   An ESD under NEPA must "avoid a loss of commodity value sufficient to jeopardize the agency's ability to accomplish project objectives directly related to resource protection or restoration." 36 C.F.R. § 218.21(b).

207.   Forest Service regulations 36 C.F.R. § 223.117(b) (sustained yield release units) and 36 C.F.R. § 223.85(a) (noncompetitive sales) prohibit the agency from selling any timber for less than appraised value.

208.   The Forest Service estimates Alternative 1 would result in "receipts" of up to an estimated $630,000.

209.   The Forest Service sold the timber rights to a third party for less than appraised value.

210.   Defendant failed to disclose appraisal information.

211.   The Forest Service did not explain the basis of the estimate or the meaning of "receipts."

212. The Forest Service's justification for the sale relying "future" mills, instead of "established" mills is arbitrary and capricious.

213. Defendant failed to sell the timber at not less than appraised value.

214. The Forest Service's economic analysis of the sale, and approval of the sale rates, was arbitrary and capricious.

215. For the foregoing reasons, the Forest Service failed to demonstrate that the project is consistent with NFMA, the forest plans, NEPA, and the APA.

216. Defendant's actions as described above are arbitrary, capricious, not in accordance with law, and without observance of procedures required by law, within the meaning of the APA, 5 U.S.C. § 706.

Plaintiff is entitled to its reasonable fees, costs, and expenses associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

## PLAINTIFF'S PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment in favor of Plaintiff and issue the following relief:

217. Declare that the Defendant Forest Service violated NEPA and the APA;

218. Declare that the Defendant Forest Service violated NFMA and the APA;

219. Declare that Defendant's actions as set forth in this Complaint are arbitrary, capricious, an abuse of discretion, are not in accordance with law and are without observance of procedures required by law and therefore must be set aside pursuant to the APA, 5 U.S.C. § 706(2);

220.  Declare that the Defendant Forest Service's Emergency Situation Determination is unlawful and/or was improperly issued;

221.  Enjoin Defendant Forest Service from continuing the operation of the Cove fire sale until Defendant has substantiated a timber appraisal;

222.  Vacate and remand the ESD, EA, DN, and FONSI to the agency;

223.  Enjoin Defendant Forest Service from continuing the operation of the Cove fire sale pursuant to the proposed project until Defendant has fully complied with the legal requirements of NEPA and NFMA;

224.  Award Plaintiff its reasonable fees, costs, and expenses associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 or other authority;

225.  And grant Plaintiff such additional and further relief as the Court deems just and equitable.

Respectfully submitted this 19th day of December, 2018.

/s/ Rachel Fazio
(as authorized on 12/19/18)
RACHEL FAZIO

/s/ Elisabeth A. Holmes
ELISABETH A. HOLMES
*Admitted Pro Hac Vice*

Attorneys for Plaintiff