Rachel Fazio (CA Bar # 187580) Local Counsel
P.O. Box 897
Big Bear City, CA 92314
Tel:  (530) 273-9290
Fax:  (909) 906-1187
rachelmfazio@gmail.com

Elisabeth Holmes (OR Bar # 120254) *Admitted Pro Hac Vice*
Blue River Law, P.C.
P.O. Box 293
Eugene, OR  97440
Tel. (541) 870-7722
eli.blueriverlaw@gmail.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION

| | | |
|---|---|---|
| CONSERVATION CONGRESS, a non-profit organization,<br>          Plaintiff,<br><br>          vs.<br><br>UNITED STATES FOREST SERVICE,<br>          Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 2:18-cv-02404-JAM-CKD<br><br>**PLAINTIFF'S MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>(Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*) |

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................... 1
II.     FACTUAL BACKGROUND ........................................................................................ 1
III.    STATUTORY AND REGULATORY BACKGROUND ............................................. 3
        A.      The National Environmental Policy Act ........................................................... 3
        B.      The National Forest Management Act, the 2004 Sierra Nevada Forest Plan
                (as amended), and the Modoc Land Resource and Management Plan. ............... 4
IV.     STANDARD OF REVIEW ......................................................................................... 5
V.      ARGUMENT ............................................................................................................... 6
        A.      Plaintiff has Standing ........................................................................................ 6
        B.      The Project, the timber sale, and the ESD violated NEPA, APA, and
                regulatory public notice requirements. .............................................................. 7
        C.      Defendant did not satisfy criteria for requesting an ESD in violation of the
                APA. ................................................................................................................... 9
        D.      The Project violates NEPA, NFMA, and the APA regarding the Northern
                Goshawk. ........................................................................................................... 10
        1.      Defendant ignored Modoc LRMP provisions and cherry-picked SNFPA
                provisions. ......................................................................................................... 10
        2.      Unsuitability determination as basis for Project was improperly reached. ........... 12
        3.      Failure to consider post-fire habitat, Goshawk presence, and to re-map PACs
                violates NEPA, NFMA and the APA. .................................................................. 13
        4.      Surveys ................................................................................................................ 16
        E.      Project approach to riparian conservation areas, streamside management
                zones, and the Modoc sucker violates NFMA, NEPA and the APA. ................ 16
        1.      Riparian conservation areas and streamside management zones. ......................... 16
        2.      Analysis for the Modoc sucker fails to satisfy NEPA, NFMA and the APA. ....... 18
        a.      Defendant does not know Modoc sucker's location in relation to the Project. .... 19
        b.      Defendant's Project analysis is inadequate. ....................................................... 20
        c.      No Modoc sucker surveys considered. ............................................................... 21
        d.      Inadequate consideration of riparian and stream area treatments and impacts to the
                Modoc sucker. .................................................................................................... 22
        e.      Sedimentation and erosion ................................................................................. 22
        F.      Project does not meet snag size, density, and habitat requirements. ................. 24
        G.      Post-decision abandonment of tree guidelines violates NEPA, NFMA, and
                the APA. ............................................................................................................ 26
        H.      Project fails to satisfy economic requirements and violates NFMA, NEPA,
                and the APA. ..................................................................................................... 27
        I.      Failure to properly appraise and modification contract prejudice the
                Project decision-making, violate NFMA, and are arbitrary or capricious. ........ 28
        1.      Appraisal ............................................................................................................ 28
        2.      Stewardship modification contract predetermined Defendant's decision. ........... 29
VI.     CONCLUSION ........................................................................................................ 30

# TABLE OF AUTHORITIES

Cases

Baltimore Gas & Electric Co. v. Nat. Res. Def. Council,
  462 U.S. 87, 97 (1983)....................................................................................7, 11, 18

Barnes v. U.S. Dept. of Transp.,
  655 F.3d 1124, 1137 (9th Cir. 2011) ......................................................................31

Blue Mountains Biodiversity Project v. Blackwood,
  161 F.3d 1208, 1213 (9th Cir. 1998) ......................................................................17

Bowen v. American Hosp.
  476 U.S. 610, 626 (1986)........................................................................................10

California v. Block,
  690 F.2d 753, 761 (9th Cir. 1982) ..........................................................................25

Cascadia Wildlands v. Goodman,
  393 F.Supp. 2d 1041, 1051-52 (D. Or. 2004) ........................................................13

City of Davis v. Coleman,
  521 F.2d 661, 676 (9th Cir. 1975) .............................................................16, 26, 32

Defenders of Wildlife v. Babbitt,
  958 F.Supp. 670, 685 (D.D.C. 1997) .....................................................................26

Dubois v. U.S. Dept. of Agriculture,
  102 F.3d 1273, 1286 (1st Cir. 1996)........................................................................17

Earth Island Institute v. U.S. Forest Service,
  442 F.3d 1147, 1159 (9th Cir. 2006) ........................................................................7

Friends of the Earth v. Laidlaw Envtl. Serv. Inc.,
  528 U.S. 167, 180-189 (2000) ................................................................................11

Great Old Broads for Wilderness v. Kimbrell,
  709 F.3d 836, 851 (9th Cir 2013) .............................................................................8

Idaho Sporting Cong. v. Rittenhouse,
  305 F.3d 957, 973 (9th Cir. 2002) ............................................................................7

Idaho Sporting Congress v. Thomas,
  137 F.3d 1146, 1149 (9th Cir. 2004) ......................................................................10

Inland Empire Public Lands Council v. U.S. Forest Serv.,
  88 F.3d 754, 757 (9th Cir. 1996) ..............................................................................8

Karuk Tribe of Cal. v. U.S. Forest Service,
  681 F.3d 1006, 1017 (9th Cir. 2012) ........................................................................9

Klamath Siskiyou Wildlands Center v. U.S. Forest Service,
  52 F.Supp. 3d 1089, 1092 (E.D. Cal. 2013).............................................................14

Klamath-Siskiyou Wildlands Center v. Bureau of Land Management,
  387 F.3d 989, 993-994 (9th Cir. 2004) ...................................................................23

Lands Council v. Powell,
  395 F.3d 1019, 1026 (9th Cir. 2005) ............................................................7, 9, 11

Lujan v. Nat'l Wildlife Fed'n,
  497 U.S. 871, 883-88 (1990) ..................................................................................11

Marsh v. Oregon Nat. Res. Council,
  490 U.S. 360, 374 (1989)........................................................................................14

Metcalf v. Daley,
   214 F.3d 1135, 1141 (9th Cir. 2000) .................................................................8
Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.,
   463 U.S. 29, 43 (1983)..................................................................................10, 18
Muckleshoot Indian Tribe v. U.S. Forest Service,
   177 F.3d 800, 811 (9th Cir. 1999) ...............................................................22
National Parks & Cons. Ass'n v. Babbit,
   241 F.3d 722, 732 (9th Cir. 2001) ...............................................................17
Native Ecosystems Council v. U.S. Forest Serv.,
   428 F.3d 1233, 1241 (9th Cir. 2005) .............................................................7
Native Ecosystems Council v. U.S. Forest Service,
   418 F.3d 953, 961 (9th Cir. 2005) .................................................................8
Neighbors of Cuddy Mountain v. U.S. Forest Serv.,
   137 F.3d 1372, 1380 (9th Cir. 1998) ........................................................17, 25
Neighbors of Cuddy Mtn. v. Alexander,
   303 F.3d 1059, 1062 (9th Cir. 2002) ...........................................................16
Northern Plains Res. Council, Inc. v. Surface Transp. Bd.,
   668 F.3d 1067, 1078-79 (9th Cir 2011) .....................................................16, 26
Northern Plains Res. Council, Inc.,
   668 F.3d at 1078-79 ....................................................................................32
Ocean Advocates v. U.S. Army Corps of Engineers,
   402 F.3d 846, 859 (9th Cir. 2004) ...............................................................10
Or. Nat. Res. Council v. Bureau of Land Mgmt.,
   625 F.3d 1092, 1121 (9th Cir. 2011) ...........................................................22
Oregon Natural Resources Council Fund v. Goodman,
   505 F.3d 884, 891-92 (9th Cir. 2007) ..........................................................16
Robertson v. Methow Valley Citizens Council,
   490 U.S. 332, 348 (1989)..........................................................................8, 25
San Luis & Delta-Mendota Water Authority v. Locke,
   776 F.3d 971, 992-993 (9th Cir. 2014) .........................................................9
Save the Yaak Committee v. Block,
   840 F.2d 714, 716-17 (9th Cir. 1988) ..........................................................34
Scientists' Institute for Public Information v. A.E.C.,
   481 F.2d 1079, 1092 (D.C. Cir. 1973)..........................................................17
Selkirk Conservation Alliance v. Forsgren,
   336 F.2d 944, 962 (9th Cir. 2003) ...............................................................17
Te-Moak Tribe of Western Shoshone of Nevada . U.S. Dept. of Interior,
   608 F.3d 592, 599 (9th Cir. 2010) ...............................................................28

Statutes
16 U.S.C. § 1531 *et seq.*.......................................................................................14
16 U.S.C. § 1601 *et seq.*........................................................................................5
16 U.S.C. § 1604(i).................................................................................................8
42 U.S.C. § 4321 *et seq.*.....................................................................................5, 7
42 U.S.C. § 433(A) ...............................................................................................11
42 U.S.C. § 4331(a) ................................................................................................7

5 U.S.C. § 701 *et seq.*..........................................................................................................9
5 U.S.C. § 702 ....................................................................................................................10
5 U.S.C. § 706(2)(A) ..........................................................................................................10

Rules
Fed. R. Civ. P. 56(a) ...........................................................................................................9

Regulations
36 C.F.R. § 218.21(c) ..........................................................................................................13
40 C.F.R. § 1500.1(a) ...........................................................................................................7
40 C.F.R. § 1508.8 ..............................................................................................................23

## I. INTRODUCTION

In the aftermath of a wildfire that covered 80,000 acres, 30,000 of which were on public lands, the U.S. Forest Service ("Defendant" or the "Forest Service") developed the Cove Fire Salvage and Restoration Project (the "Project"), specifically targeting for logging 1,380 acres of large mature trees in Northern Goshawk protected activity centers ("PACs"), and riparian conservation areas ("RCAs") adjoining the sensitive habitat of the recently-delisted Modoc sucker. In preparing the Project, Defendant: violated public notice requirements; sought an Emergency Situation Determination (ESD) on grounds not supported by the facts; tried to remedy a multitude of Project effects requiring mitigation by developing integrated design features (IDFs) that run afoul of the National Forest Management Act (16 U.S.C. § 1601 *et seq.*); failed to conduct a "hard look" under the National Environmental Policy Act (42 U.S.C. § 4321 *et seq.*) for key natural resources including the Goshawk, Modoc sucker, sensitive riparian areas; and sold 6.3 MMBF of timber for less than appraised value. Conservation Congress ("Plaintiff") brings suit seeking declaratory and injunctive relief to require the Project's compliance with NEPA, NFMA, and the APA. Defendant's justifications for the Project are untenable in light of the undisputed facts.

## II. FACTUAL BACKGROUND

Plaintiff incorporates its Statement of Undisputed Facts ("SUF") filed herewith, Declarations of Plaintiff's Executive Director Denise Boggs (who is also a member) and four (4) members filed in this matter, documents identified in Plaintiff's Request for Judicial Notice filed herewith and attached to the Declaration of Elisabeth Holmes ("Holmes Decl.") as exhibits, the Administrative Records lodged with the Court, and the facts cited in this memorandum.

The Cove fire started on July 24, 2017 by lighting and resulted in a mosaic of vegetation burn severity across the fire area. The Cove Fire Salvage and Restoration Project (the Project) is contained within the Big Valley Ranger District of the Modoc National Forest, Northern California, in the Eastern Sierra Nevada mountains. The Project is located approximately 3 miles northwest of Adin, California and is within the North Adin Management Area, identified in the Modoc National Forest Land and Resource Management Plan. (Modoc LRMP). The Project is 1,380 acres within the Big Valley Sustained Yield Unit (BVSYU), stretching through Barber Canyon and the Dutch Flat. The Project area is home to old, mature trees of California Wildlife Habitat Relationship 4M and 4D categories, riparian conservation areas, three Northern Goshawk Protected Activity Centers (PACs), and a recently delisted fish species, the Modoc sucker.

Defendant prepared a timber sale to salvage log the Cove area, removing merchantable overstory trees and then subsequently cut the remaining smaller trees and clear native shrubs in a portion of the Cove fire area, followed by replanting. Defendant prepared an EA for the Project. The EA and the DN/FONSI specifically affirm to a need to follow the Sierra Nevada Forest Plan (as amended) (SNFPA) and Modoc LRMP. DN/FONSI at 1. To mitigate the effects of the Project and reach a finding of no significant impact, Defendant created integrated design features (IDFs) for natural resources. The IDFs pulled from both the SNFPA and the Modoc LRMP. Defendant conducted scoping, prepared a draft environmental assessment (EA), and issued a final EA, DN/FONSI, and an emergency situation determination. Plaintiff commented at the scoping stage and on the draft EA. Defendant did not post the final decision documents on its website until after it had sold the Project to Pit RCD. Plaintiff filed suit under NEPA, NFMA, and the APA, challenging various aspects of the Project, including, in summary: public notice

requirements; failure to conduct a "hard look" as to natural resources including the Northern

Goshawk and the Modoc sucker and their habitats' mature trees, snag, and riparian features;

failure to comply with the NFMA requirements; and the failure to appraise the 6.3 MMBF of

timber. Shortly after Plaintiff filed suit, it learned the Project was well underway. Plaintiff sought

a preliminary injunction to protect the Dutch Flat portion of the Project. Plaintiff's request was

denied and the issue is on appeal with oral argument scheduled for May 14, 2019.

## III. STATUTORY AND REGULATORY BACKGROUND

A. <u>The National Environmental Policy Act</u>

NEPA, 42 U.S.C. § 4321 *et seq.*, is "our basic national charter for protection of the

environment." 40 C.F.R. § 1500.1(a). NEPA's disclosures are two-fold: (1) to insure that the

agency has carefully and fully contemplated the environmental effects of its action; and (2) to

insure that the public has sufficient information to challenge the agency's action. See <u>Baltimore</u>

<u>Gas & Electric Co. v. Nat. Res. Def. Council</u>, 462 U.S. 87, 97 (1983); <u>Lands Council v. Powell</u>,

395 F.3d 1019, 1027 (9th Cir. 2005) ("The purpose of NEPA is to require disclosure of relevant

environmental considerations that were given a 'hard look' by the agency, and thereby to permit

informed public comment on proposed action and any choices or alternatives that might be

pursued with less environmental harm."); (hard look includes "considering all foreseeable direct

and indirect impacts) <u>Idaho Sporting Cong. v. Rittenhouse</u>, 305 F.3d 957, 973 (9th Cir. 2002);

(hard look "involve[s] a discussion of adverse impacts that does not improperly minimize

negative side effects." <u>Earth Island Institute v. U.S. Forest Service</u>, 442 F.3d 1147, 1159 (9th Cir.

2006) (quoting <u>Native Ecosystems Council v. U.S. Forest Serv.</u>, 428 F.3d 1233, 1241 (9th Cir.

2005). In NEPA, Congress recognized the "profound impact" of human activities on the

environment and declared a national policy "to create and maintain conditions under which man

and nature can exist in productive harmony." 42 U.S.C. § 4331(a). To further this policy, NEPA "establishes 'action-forcing' procedures that require agencies to take a 'hard look' at environmental consequences." Metcalf v. Daley, 214 F.3d 1135, 1141 (9th Cir. 2000) (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 348 (1989)).

    B.  The National Forest Management Act, the 2004 Sierra Nevada Forest Plan (as amended), and the Modoc Land Resource and Management Plan.

The National Forest Management Act, 16 U.S.C. § 1600 *et seq.* governs Defendant's management of National Forests. NFMA requires Defendant to prepare Land and Resource Management Plans for each National Forest, to guide natural resource management forestwide through standards and guidelines and monitoring requirements. For the Modoc, Defendant adopted the 1991 Modoc Land Resource and Management Plan ("Modoc LRMP"), and the 2004 Sierra Nevada Forest Plan (as amended) ("SNFPA"). All site-specific actions must comply with the forest plans. 16 U.S.C. § 1604(i) ("Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System land shall be consistent with the land management plans."); Inland Empire Public Lands Council v. U.S. Forest Serv., 88 F.3d 754, 757 (9th Cir. 1996); Great Old Broads for Wilderness v. Kimbrell, 709 F.3d 836, 851 (9th Cir 2013) ("the NFMA prohibits site-specific activities that are inconsistent with the governing Forest Plan."). Failure to comply with a forest plan is a violation of NFMA. Native Ecosystems Council v. U.S. Forest Service, 418 F.3d 953, 961 (9th Cir. 2005). The Project is within the Big Valley Federal Sustained Yield Unit, which is exempted from the SNFPA (AR 10136, SNFPA ROD at 15), but Defendant voluntarily incorporated and relied on the SNFPA for the Project. The EA Purpose and Need for the Project Goals 1 (economic) and 4 (ecological restoration) cite to the SNFPA (EA at 4); Goal 2 (roads) cites to the Modoc LRMP; Goal 3 (fuel management) does not cite to either the SNFPA or the Modoc LRMP. See AR 46-48 (EA at 4-6).

The integrated design features (IDFs) for the Project "are resource protection measures that are developed by specialists and incorporated as part of the Proposed Action for this project. They are *in addition to* best management practices (BMPs) and Standards and Guidelines from the Modoc LRMP, as amended." AR 57 (EA at 15) (emphasis added). The IDFs at issue in this litigation focus primarily on 17 IDFs for riparian conservation areas and water quality protection measures (AR 58-60, EA at 16-18); 8 IDFs for soil quality standards and best management practices (AR 61, EA at 19); and 5 IDFs for threatened, endangered, and sensitive wildlife species. AR 61-62 (EA at 19-20).[1] During litigation, Defendant first denied, then affirmatively asserted, SNFPA compliance. ECF No. 22-3 (Decl. Peter Johnston ("Johnston Decl.") ¶ 6); Defendant's Answering Br. on Appeal at 11 (n. 1), 17, 41. Defendant affirmatively elected, in its discretion, to create "hybrid" IDFs for the Project that relied on SNFPA and the Modoc LRMP, so Defendant should be held to those plans' standards. Where the SNFPA or the Modoc LRMP contains a standard that Defendant ignored or did not satisfy, Defendant should be found in violation of that plan.

## IV. STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Under NEPA and NFMA, an agency's final agency action is reviewable under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* See San Luis & Delta-Mendota Water Authority v. Locke, 776 F.3d 971, 992-993 (9th Cir. 2014); Karuk Tribe of Cal. v. U.S. Forest Service, 681 F.3d 1006, 1017 (9th Cir. 2012); Lands Council v. Powell, 395 F.3d 1019, 1026 (9th Cir. 2005). The

---

[1] The EA states that the threatened, endangered, and sensitive wildlife species' IDFs "have been incorporated into the proposed action consistent with Standards and Guidelines identified in the SNFPA ROD (2004)." AR 61 (EA at 19).

APA requires a reviewing court to "hold unlawful and set aside agency action" that is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Although the arbitrary or capricious standard of review applied in APA cases s deferential, the agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,'" and this Court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983) (citations omitted): Idaho Sporting Congress v. Thomas, 137 F.3d 1146, 1149 (9th Cir. 2004). "Agency deference has not come so far that we will uphold regulations whenever it is possible to 'conceive a bias' for administrative action." Bowen v. American Hosp. 476 U.S. 610, 626 (1986). Reviewing courts must not merely "rubber-stamp administrative decisions." Ocean Advocates v. U.S. Army Corps of Engineers, 402 F.3d 846, 859 (9th Cir. 2004).

## V. ARGUMENT

### A. Plaintiff has Standing

Plaintiff has standing to bring this action because it is adversely affected and aggrieved by the Project. 5 U.S.C. § 702. Plaintiff has members and supporters that utilize and enjoy the Project area for a wide variety of uses. See ECF Nos. 12-15, 29, 64-68 (Declarations of Denise Boggs (Boggs Decl.); Declaration of Kyle Haines (Haines Decl.); Declarations of Lyle Lewis (Lewis Decl.); Declarations of Doug Bevington (Bevington Decl.); Declarations of Chad Hanson (Hanson Decl.). Plaintiff and its members and supporters are suffering, and will suffer, harm to their many interests as a result of the Project. See Id. Declarants' injuries fall within the zone of interests that NEPA, NMFA, and the APA were intended to protect, and therefore Plaintiff has

standing to pursue its claims in this court. <u>Friends of the Earth v. Laidlaw Envtl. Serv. Inc.</u>, 528

U.S. 167, 180-189 (2000); <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 883-88 (1990).

    B.  <u>The Project, the timber sale, and the ESD violated NEPA, APA, and regulatory public notice requirements.</u>

    The Project involves salvage and restoration work and selling public resources. Public

notice must occur for scoping, the EA, the ESD, and the timber sale. At nearly every turn in this

Project, Defendant failed to comply with the basic public notice requirements, in violation of

NEPA's core public participation requirements, and constituting arbitrary or capricious action

under the APA.  One of the primary goals of NEPA's disclosure requirements is to insure that

the public has sufficient information to challenge the agency's action. 42 U.S.C. § 433(A); See

<u>Baltimore Gas & Electric Co. v. Natural Resources Defense Council</u>, 462 U.S. 87, 97 (1983);

<u>Lands Council v. Powell</u>, 395 F.3d 1019, 1027 (9th Cir. 2005).

    The SOPA notifies the public of a potential project. In the DN/FONSI, Modoc National

Forest Supervisor McAdams claims the Project was listed in SOPA (AR 000003) (DN/FONSI at

3) (see also EA at 7), but in fact it was not listed until *after* the public scoping comment period

expired. Holmes Decl. Ex. 1 (Jan. – Mar. 2018 SOPA and April – June 2018 SOPA); ECF No.

66 (Boggs Decl. ¶¶ 30-33). Defendant finalized its decision on June 9, 2019 but did not notify

members of the public who commented on the Project. AR 1 (DN/FONSI at 1). Instead,

Defendant requested an ESD on June 19, 2018 (AR 10, Decision Memorandum) and kept the

Final EA under wraps. On July 12, 2018, Defendant received the ESD. AR 9, 11 (DN/FONSI at

9 and Decision Memorandum). Defendant then waited two weeks after it received the ESD, and

after it sold the Project, to *finally* post final EA documents online on July 26, 2018. Holmes

Decl. Ex. 2. Plaintiff learned of the decision on July 31, 2018 when it looked at the Modoc's

website. Defendant's regulations require posting of EA documents "upon distribution" and on the internet within 4 calendar days. 36 C.F.R. § 218.7(b)-(d).

For sales in excess of $10,000 in appraised value,[2] advertisements must run for 30 days. 36 C.F.R. § 223.80. Smaller sales also will be advertised if the sale officer deems it advisable. Id. On May 10, 2018, before the public comment period on the draft EA ended (May 29, 2018), and before a final EA or DN/FONSI issued, Defendant published an advertisement for the Project sale with the minimum bid of $3,550 and invited purchasers from outside the BVFSYU to apply. AR 101440-41 (legal ad). Plaintiff notified Defendant that advertising before a final decision was improper, and Defendant withdrew the advertisement. AR 10441 (legal ad). Again on July 5, 2018, before publicly issuing a final EA and DN/FONSI on the Project, Defendant advertised the sale. AR 010439 (legal ad). The advertisement was not withdrawn. Had Defendant notified the public of the Final EA and run the advertisement consistent with its regulations, Plaintiff could have protected its interests before logging began.[3]

ESDs are not subject to administrative review and implementation may begin "immediately" after public notice. 36 C.F.R. § 218.21(c)(1), (d)(1). Notice of an ESD shall occur "*as soon as practicable* after the decision notice is signed." 36 C.F.R. § 220.7(d) (emphasis added). Here, Defendant requested the ESD on June 19, 2018 (AR 12, 23) (ESD letter), received it on July 12, 2018 (AR 11) (Decision Memorandum), awarded the contract to Pit RCD who accepted a bid on July 18, 2018 and contracted to Tubit Enterprises, Inc. (Holmes Decl. Ex. 6, 7),

---

[2] See § V.F.1. infra challenging Defendant's failure to appraise the sale.
[3] The fact that the Project was presented as an "emergency" does not eliminate public notice requirements. In emergency situations where "prompt removal" of timber is essential to avoid deterioration or minimize inspect spread, formal advertising still must occur. 36 C.F.R. § 223.81 (formal advertising and such advertising must not be authorized for less than 7 days). Nor does the fact that the Project is in a sustained yield unit eliminate the requirement to advertise the timber sale. In sustained yield units, a sale for more than $500 stumpage value may *only* be made after public notice has occurred for four consecutive weeks, and that sale must be at not less than appraised value. 36 C.F.R. § 223.117(b).

and sold the timber on July 26, 2018 (Holmes Decl. Ex. 4). It was not until that last day that

Defendant finally posted the information on its website. Holmes Decl. Ex. 2.[4] Public notice shall

include whether a project is subject to an ESD. 36 C.F.R. § 218.24(b)(3). If NEPA review and an

ESD are sought at the same time public notice of both must occur. See <u>Cascadia Wildands v.</u>

<u>Goodman</u>, 393 F.Supp. 2d 1041, 1051-52 (D. Or. 2004).

1. **C.** **<u>Defendant did not satisfy criteria for requesting an ESD in</u>**
**<u>violation of the APA.</u>**

An ESD request must show that "immediate implementation of a decision is necessary to

achieve one or more of the following: Relief from hazards threatening human health and safety;

mitigation of threats to natural resources on NFS or adjacent lands; avoiding a loss of commodity

value sufficient to jeopardize the agency's ability to accomplish project objectives directly

related to resource protection or restoration." 36 C.F.R. § 218.21(c). Any claimed loss of

commodity value is due to Defendant's failure to appraise the timber and its conflating 2018

Cove Project financials with those of a 2014 Black Mountain Project (located on a completely

different district) and two other unidentified "green" timber sales intended to sweeten the Cove

Project (see § V.F. *infra*); not to delay. Defendant did not show that the Project required

"emergency" implementation to mitigate threats to natural resources. Lastly, Defendant did not

sustain its burden that the true need for the ESD was safety. Before Project scoping began, in

September 2017 Defendant lifted a public road closure order. Holmes Decl. Ex. 5. After

Defendant obtained the ESD and implemented the Project, it promptly abandoned the 2012

Hazard Tree Guidelines, which guide decision-making on trees that risk harming human life or

property. The "hard look" requirement to evaluate environmental effects of a proposed action

---

[4] This information is posted for numerous projects *except* the Project. See Holmes Decl. Ex. 3.

continues, even after a project received initial approval. See <u>Klamath Siskiyou Wildlands Center</u> <u>v. U.S. Forest Service</u>, 52 F.Supp. 3d 1089, 1092 (E.D. Cal. 2013) (citing <u>Marsh v. Oregon Nat.</u> <u>Res. Council</u>, 490 U.S. 360, 374 (1989).

    D.   <u>The Project violates NEPA, NFMA, and the APA regarding the Northern Goshawk</u>.

      The Project has three Goshawk Protected Activity Centers (PACs). AR 43 (EA at 1). The Northern Goshawk ("Goshawk") is a candidate for uplisting under the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*, and has been the subject of several petitions and lawsuits seeking its protection. <u>See</u> ECF No. 12 (Declaration of Denise Boggs in Support of Preliminary Injunction ¶ 19). The Goshawk is a management indicator species (MIS) on the Modoc. AR 15057 (Modoc LRMP Final EIS 3-102). The EA and MIS Report treat the Goshawk as forest sensitive species (FSS), but ignore its MIS status. AR 85-86 (EA 43-44); AR 219-220 (MIS Report 5-6 (Table 1)). Goshawk habitat contains large, mature trees. AR 15057 (Modoc LRMP Final EIS at 3-102 ("Because its presence indicates the availability and condition of older forest ecosystems, the goshawk was selected as a Forest management indicator species.")); AR 7124 (USFS Management Recommendations for the Northern Goshawk in the Southwestern United States, Figure 1 at 2 identifying "old forest" as "DBH: 24"+").

    1.   <u>Defendant ignored Modoc LRMP provisions and cherry-picked SNFPA</u> <u>provisions.</u>

      For the Project activities, Defendant developed 5 IDFs relating to PAC designations, surveys and survey protocol, and avoiding breeding disturbances. AR 61-62 (EA 19-20). None of these IDFs relate to or consider the Modoc LRMP Goshawk requirements. The Modoc LRMP requirements include: manage 100 nest stands of at least medium habitat capability forest wide (AR 14458 (Modoc LRMP Forest-wide S&Gs 4-26(2)(A)); maintain Goshawk territories forest-wide of at least 100 acres with additional surrounding acreage

delineated and not to exceed 12 miles between territories (AR 14523 (Modoc LRMP Raptor Management Prescription 4-91); not to locate nest stands in areas of intensive timber management (Id.); enhance prey base populations within two miles of nest stands (Id.); inventory and protect active Goshawk nest territories necessary to meet population targets. AR 14618 (North Adin Management Area S&G 4-186). The Project's IDFs # 41 - # 44 do not limit timber activities in PACs, do not adjust PAC boundaries, or provide for a 2 mile prey based habitat zone. Defendant's failure to demonstrate compliance with the Modoc LRMP violates NFMA, NEPA's "hard look" requirement, and the APA.

Defendant elected to incorporate *some* but not all of the Goshawk SNFPA standards and guidelines in its IDFs. For example, SNFPA S&G #76 allows Defendant to "modify" LOP buffer distances, but in IDF # 43 Defendant copied verbatim SNFPA S&G #76 except it allowed itself to "reduce" LOP buffer distances. *Cf.* SNFPA FEIS ROD at 60 with AR 62 (EA at 20). Additionally, IDFs # 41 and # 42 function as "partial" but incomplete adoptions of SNFPA S&Gs # 71's treatment and PAC designation and re-mapping provisions (essentially ignoring the re-mapping provisions). AR 10159, 10180 (SNFPA ROD at 38, 59). Similar to its approach to the Modoc LRMP, Defendant ignored forest-wide Goshawk SNFPA provisions (such as SNFPA S&G # 81 addressing forest-wide annual limitations on mechanical treatments). AR 10182 (SNFPA ROD at 61). Under SNFPA S&G # 16, salvage harvests may occur if PACs have been rendered "unsuitable." AR 10174 (SNFPA ROD at 53). While the Project did not specifically incorporate SNFPA S&G # 16, Defendant's "unsuitability" conclusion is not supported and should be withdrawn. To the extent Defendant voluntarily elected some but not other SNFPA provisions, it did so arbitrarily or capriciously, and without giving its actions the required hard look under NEPA. The Project must be consistent with the forest plans, and the

analysis must show that each project is consistent with the plan. See <u>Neighbors of Cuddy Mtn. v.</u>

<u>Alexander</u>, 303 F.3d 1059, 1062 (9th Cir. 2002). Failure to disclose impacts and discuss effects

are NFMA violations. See <u>Oregon Natural Resources Council Fund v. Goodman</u>, 505 F.3d 884,

891-92 (9th Cir. 2007).

        2.      <u>Unsuitability determination as basis for Project was improperly reached.</u>

        Defendant made its unsuitability determination *before* obtaining and analyzing

relevant information. Its determination was made before the April 2018 Draft EA, June 9, 2018

DN/FONSI, and before trees flushed in the first post-fire spring (producing new green needles

from surviving buds a year after the fire, demonstrating their innate survival strategy response to

the fire). The EA states that "[f]uture analysis will determine if the PACs have been rendered

unsuitable as goshawk nesting habitat." AR 43 (EA at 1). Defendant also presumed burned forest

automatically meant unsuitability, but under its own survey protocol, habitat quality can be

"quite low" but "still be included because goshawks are known to use small patches of habitat in

otherwise unsuitable habitat, such as…patches of late seral forest in burned or harvested areas"

and protocols encourage setting "a very low threshold based on local landscape pattern." AR

15989 (Survey Protocol at 2-10). Defendant also acknowledges the need to re-map the PACs;

had it re-mapped them, it may not have concluded that the PACs were "unsuitable." By kicking

the can down the road for the Goshawk re-mapping, Defendant impermissibly shirked its

responsibilities under NEPA. <u>City of Davis v. Coleman</u>, 521 F.2d 661, 676 (9th Cir. 1975)

("Uncertainty or the necessity for forecasting environmental impact cannot forever excuse

environmental analysis."); <u>Northern Plains Res. Council, Inc. v. Surface Transp. Bd.</u>, 668 F.3d

1067, 1078-79 (9th Cir 2011); see also <u>Dubois v. U.S. Dept. of Agriculture</u>, 102 F.3d 1273, 1286

(1st Cir. 1996) (court "must reject any attempt by agencies to shirk their responsibilities under

NEPA by labeling any and all discussion of future environmental effects as 'crystal ball inquiry.'"); Scientists' Institute for Public Information v. A.E.C., 481 F.2d 1079, 1092 (D.C. Cir. 1973); Selkirk Conservation Alliance v. Forsgren, 336 F.2d 944, 962 (9th Cir. 2003); Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372, 1380 (9th Cir. 1998) (not appropriate to defer consideration of "impacts a future date.")' National Parks & Cons. Ass'n v. Babbit, 241 F.3d 722, 732 (9th Cir. 2001) (the purpose of NEPA is "to obviate the need for speculation by insuring that available data are gathered and analyzed prior to the implementation of the proposed action.). A failure to "discuss and consider" evidence contrary to the agency's position suggests that it "did not take the requisite 'hard look' at the environmental consequences" of its proposed action. Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1213 (9th Cir. 1998).

### 3. Failure to consider post-fire habitat, Goshawk presence, and to re-map PACs violates NEPA, NFMA and the APA.

Defendant's records show that post-fire, green habitat remained in both Dutch Flat Creek and Dutch Loop PACs. AR 95-96 (EA at 53-54); Johnston Decl. ¶ 13; AR 270 (BE/BA at 17); 2017 and 2018 surveys; see also (AR 214) (2018 survey map of PACs in the Project area). Project records acknowledge that Goshawks use post-fire habitat for foraging in snag and downed wood areas (see AR 270 (BE/BA 17)), and that the Project would reduce the quantity and quality of those areas. Id. Post-decisional surveys (also that were pre-flushing) (AR 211) (2018 surveys) that suggest more green suitable habitat became available and there was little large tree mortality. AR 96 (EA at 54) (Dutch Flat Creek PAC still had approximately 106 acres of green tree habitat with low (1%-50%). Defendant acknowledges the forest needs time to recover from the fire. Johnston Decl. ¶ 17 ("the Forest Service will not know for two-to-five years how many trees will eventually die from the stress of the Cove Fire, a key fact to consider

in re-mapping a PAC."). Had Defendant seriously accounted for this information during Project planning it may have reached a different decision than to salvage log in PACs with green habitat. See Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983) (agency must examine relevant data and articulate a satisfactory explanation for its action.").

Defendant's failure to re-map the PACs is not supported and is contrary to law; the facts show there is not rational connection between the facts found and the choice made. See Baltimore Gas and Electric v. NRDC, 462 U.S. 87, 105-106 (1983) (citations omitted). First of all, Defendant knows it can and should re-map the PACs. See, e.g. 2017 and 2018 survey records repeatedly indicate that the Dutch Flat "PAC needs to be remapped. As of Sept 2018, this has not yet happened." AR 211, 320 (2018 survey; 2017 survey). Defendant is also aware habitat was available for re-mapping at time of the decision, but proposed to conduct "future surveys" and re-map the PACs "at a later date." AR 131, 182 (Draft EA at 1, 52); AR 268-269 (BE/BA 15-16); AR 43, 94 (EA at 1, 52)). Defendant also knew that re-mapping needed to occur *before* logging. See, e.g., AR 96 (EA at 54) (Dutch Flat Creek PAC still had approximately 106 acres of green tree habitat with low (1%-50%) burn severity, and that "[n]o surviving green forest goshawk habitat would be rendered unsuitable under Alternative 1."; Johnston Decl. ¶¶ 10, 13, 18 (Dutch Flat PAC could be remapped under 2004 SNFPA guidelines and still has 106 acres of green habitat and acreage currently targeted for roadside hazard (40.4 acres of nesting habitat) and salvage (37.6 acres) logging could be made part of the PAC); AR 320-321 (2017 survey); AR 211-212 (2018 survey); (in the Project area "potential habitat may still be present to provide nesting opportunities." AR 270 (BE/BA at 17); AR 211 (survey reports dated June 11 – July 20, 2018 indicate some potentially viable habitat, or at least uncertainty regarding habitat status in

both Dutch Loop and Dutch Flat PACs. AR 211 ((2018 survey) (in Dutch Loop PAC "[s]ome stands surrounding current PAC units only underburned, and PAC could be re-mapped with 200 acres of marginal habitat")); AR 212 (2018 survey) (in Dutch Flat PAC there is a "lesser burned stand", "green (suitable) habitat", a "green forest portion of PAC" and "nest itself burned but tree survived, nest grove underburned with little large tree mortality.")). Similarly, the Dutch Loop PAC was underburned and may also be able to be re-mapped. *See* AR 320-321 (2017 survey); AR 212-213 (2018 survey). With the Project 67% completed, the PACs are still not re-mapped.

In lieu of promoting snag and downed wood environment, which would increase Goshawks' prey opportunities and be consistent with the Modoc LRMP, the Project proposes Project proposes opening the tree canopy for livestock grazing and distribution throughout the Project area. AR 74-75, 77, 94-95, 116 (EA at 32-33, 35, 52, 53, 74).[5] Cutting down the trees in PACs for a species whose primary habitat is forest, and a species who uses post-fire habitat, will necessarily affect the future suitability of the habitat, thus surveys, and re-mapping, thus are related to the Project.[6] Defendant claims (but does not identify) that suitable habitat is available *outside* the fire perimeter (AR 97 (EA at 55)). Defendant did not recognize other direct, indirect, and cumulative effects of its actions. See, e.g., AR 97 (EA at 55) (displacement of Goshawks (which Defendant claims are not in the area) foraging in the Project area "until project actions…are completed" was not a significant impact, but simultaneously providing no

---

[5] The Project intends to open up the area for livestock and grazing but fails to identify and consider livestock direct, indirect, or cumulative impacts. The Modoc LRMP Riparian Prescription, Range Management Direction instructs Defendant to manage grazing to protect riparian-dependent resources and to identify and correct *potential* or existing resource conflicts through allotment management plans, and to evaluate these conflicts in the broader aquatic riparian meadow and ecosystem strategy. AR 14567-77 (Modoc LRMP at 4-135 to 4-145). The Project does not demonstrate any control methods consistent with Modoc LRMP to keep livestock out of riparian areas and SMZs, and how it will avoid livestock streambank erosion and deterioration.
[6] Plaintiff notes that there is no map showing the overlay of the salvage logging areas and the PACs. *Compare* AR 56 (EA at 14) (salvage logging map) with AR 214 (map of PACs).

completion date for Project actions)); AR 96, 98 (EA at 54, 56) (Project will "result only in minor short term effects" to the Goshawk which belies Defendant's "no effect" conclusion)).

    4.    <u>Surveys</u>

Defendant's surveys confirm Goshawks are still using the Dutch Flat Creek area for at least one, if not more, purposes. AR 210-215 (2018 survey); AR 319-321 (2017 survey pp. 1-3).[7] In one post-decisional survey, Defendant flushed a "raptor" near the Dutch Flat PAC. AR 212 (2018 survey); see also <u>id.</u> (2018 survey pp. 3 Line 13 ("Goshawk present.")). In a different survey, on June 11, 2018, Defendant detected a Goshawk "alarm call" in Dutch Flat Loop PAC (<u>id.</u> (2018 survey pp. 3 Line 12)). After Plaintiff filed its Complaint, Defendant decided the "alarm call" was "just" a bird foraging in the area. Johnston Decl. ¶ 15. Survey protocols associate "alarm calls" with defensive vocalizations usually emitted for nest intruders, not with foraging activities. Johnston Decl. ¶ 16; AR 16007-16008 (Survey Protocol). Defendant acknowledges its surveys have been limited. See, e.g., nests "were not searched" in 2018 (AR 212 (2018 survey)); surveys in the Project area have been limited for at least a decade (<u>See</u> AR 210-215 (2018 survey). 2017 and 2018 surveys focused only on Nest # 1 as "[s]urveys since 2007 have been solely checking Nest #1, sometimes with a broadcast or two nearby" (AR 320 (2018 surveys)). Only one 2017 and one 2018 survey pre-dated the June 9, 2018 final EA; the remaining surveys were conducted after the decision document was finalized. AR 319, 210.

    E.    <u>Project approach to riparian conservation areas, streamside management zones, and the Modoc sucker violates NFMA, NEPA and the APA.</u>

    1.    <u>Riparian conservation areas and streamside management zones.</u>

---

[7] Plaintiff notes the surveys Defendant relies on focus on Nest # 1 only, with some nearby broadcasting, despite the presence of multiple nests sites in the three PACs.

In the interior reaches of the Project, Defendant proposes logging in riparian areas. These riparian areas have nothing to do with public safety, and are solely designed to capture large, mature trees. How Defendant will determine which trees to cut is unclear as the Project does not demonstrate compliance with the Timber Guidelines for Riparian Areas (Modoc LRMP at 4-140 to 4-141) and Defendant abandoned Hazard Tree Guidelines. Without a maximum dbh restriction the Project cannot satisfy the forest plans or did it give the Project a "hard look."

The Project area contains streams, RCAs, SMZs, and is "adjacent to" Modoc sucker habitat, but does not clearly identify these resources' locations in relation to Project activities. Post-decision, the Pit RCD provided the clearest information on stream locations, not the Defendant. Holmes Decl. Ex. 6 at 72-77. Without any meaningful identification of, and correlation of the RCAs, SMZs, and riparian habitats to the Project activities, it was impossible for Defendant to conduct NEPA's requisite "hard look" while evaluating the Project. Without this information, Project conclusions as to the streams' intermittent or ephemeral characteristics, their hydrologic connections, their role in delivering sediment in extreme rain or snow events are unsupported.

Stream classification is a necessary first step to determine what Modoc LRMP standards apply, and what IDFs are appropriate for specific waters.[8] Here, Defendant did not identify Project water bodies with any specificity (despite Pit RCD having the information, Holmes Decl. Ex. 6 at 72-77), made general statements about the existence of SMZs and RCAs within the Project, but did not support its conclusions regarding impacts to downstream waters and species (including the Modoc sucker), or impacts of mechanical and non-mechanical treatment in RCAs

---

[8] The Project proposes 17 IDFs for RCA and water quality protection measures. The SNFPA is the basis for several of these IDFs. See AR 58-60 (EA 16-18 IDF # 15 and Table 4 (referring to SNFPA and its RCOs)).

and waters within the Project area. This information is essential. See, e.g., <u>Or. Nat. Res. Council</u> <u>v. Bureau of Land Mgmt.</u>, 625 F.3d 1092, 1121 (9th Cir. 2011) (where an agency has not used a methodology to analyze the effects of a project, the court "cannot defer to a void."); <u>Muckleshoot Indian Tribe v. U.S. Forest Service</u>, 177 F.3d 800, 811 (9th Cir. 1999) (broad and general statements did not support specific, reasoned conclusions). For example, Modoc LRMP App. T states that very high and high gradient bedrock streams, and moderate gradient cobble/gravel streams must "maintain 50-70% of the timbered sites within SMZs in an old-growth state" which provides fish habitat. AR 14752, 14757-58 (Modoc LRMP T-1, T-6 to T-7). Another example is IDF # 15 and Table 4, which propose to keep ground-based equipment off areas with slopes > 20% within RCAs (AR 59) (EA at 17); but it is the stream classification that determines appropriate distances based on the slope. AR 14735-36 (Modoc LRMP App. M-1). Failure to properly identify riparian and stream information and correlate this with the IDFs, shows that the Defendant does not comply with the forest plan, and has not considered the direct, indirect and cumulative effects or given the Project NEPA's "hard look". See, e.g., <u>Klamath-Siskiyou Wildlands Center v. Bureau of Land Management</u>, 387 F.3d 989, 993-994 (9th Cir. 2004) ("[g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided.'") (citation omitted).

      2.  <u>Analysis for the Modoc sucker fails to satisfy NEPA, NFMA and the APA</u>.

The Modoc sucker (a fish) was federally protected as endangered from 1985 until 2014, is subject to a 2015 Post-Delisting Monitoring Plan ("Sucker Plan"), is a management indicator species in the Modoc LRMP, and is a forest sensitive species in the Project EA. The Project fails under NEPA to give a "hard look" to relevant information regarding the Modoc sucker, the

Project's impacts on the species, and under NFMA to demonstrate compliance with the forest plan. Failure to identify direct effects caused by the action, or reasonably foreseeable indirect effects of the Project on the Modoc sucker violate NEPA. 40 C.F.R. § 1508.8.

a.  <u>Defendant does not know Modoc sucker's location in relation to the Project.</u>

The Modoc sucker has a very limited range, which includes what is now the State of California Dutch Flat Creek Wildlife Area ("Wildlife Area"). AR 544-545, 549 (Sucker Plan at 2, 7). The Wildlife Area is located within the Cove fire perimeter. Despite multiple requests during the litigation, Defendant never identified the Modoc sucker's habitat in relation to the Project. No map specifically indicates where the Modoc sucker's habitat is located in relation to the Project. In response to Plaintiff's request, Defendant released a one-page Wildlife Area map on September 18, 2018, which covers the four counties of Lassen, Shasta, Siskiyou, and Modoc counties. AR 322. This map is too general for Defendant to conclude that the Project will not effect the fish.

The only qualifications offered is that the Modoc sucker's habitat is "adjacent to" the Project ((AR 49, 51, 58-60, 71) (EA at 7, 9, 16-18, 29); AR 7706-7710 (Hydrology Report 7-11) (treatments in riparian areas)), and that the Project has been designed to "avoid" Dutch Flat Creek and its floodplain, and "other resource topic" design features "will minimize effects of sediment transport from proposed activities. AR 265 (BE/BA at 12). Defendant's riparian and streamside management zone analyses are faulty, so by extension the protections allegedly provided to the Modoc sucker ring hollow. Defendant's post-Project argument that "no operations will occur" in Modoc sucker habitat is unsupported by the administrative record. The generalized facts do not rationally allow for a conclusion that the Project will "eliminate" effects to the Modoc sucker.

b. <u>Defendant's Project analysis is inadequate.</u>

The sum total of Defendant's "analysis" of the Project's impacts and effects on the

Modoc sucker are limited to one conclusory, unsupported footnote, which reads:

> The Modoc sucker is known to occupy Dutch Flat Creek, located adjacent to the proposed project. The species distribution is very limited and occurs within the Dutch Flat Creek Wildlife Area near the upstream boundary. The habitat occupied is within a very entrenched section of stream which retains water in a few isolated pools when the rest of the creek becomes dry. The majority of the treatment acreage is in another subwatershed (Barber Canyon) that is not hydrologically connected to Dutch Flat Creek. Ephemeral tributaries located near the Dutch Flat Creek Wildlife Area within treatment areas are essentially disconnected relative to bedload sediment transport from the existing channel because they lose slope at distances greater than 100 meters before the channel joins the creek. This results in sediment deposition on the historic floodplain at locations far away from the existing channel, as the entrenched channel is currently on the east side of the floodplain. Based on the above factors, the Modoc sucker would not be effected by the proposed project. AR 49 (EA at 7, n. 4).

The EA does not breakdown the Project acreage between Barber Canyon and Dutch Flat

Creek; it does not identify the distance between the logging and shrub removal activities and

Modoc sucker habitat, or what constitutes "far away" (AR 49 (EA at 7, n. 4)); it does not support

its conclusion that the multitude of streams leading into the Dutch Flat Creek are ephemeral and

"essentially disconnected", nor does it explain how much bedload sediment transport is required

to categorize the quantity as "relative" to the "essentially disconnected" stream. Additionally,

since the Modoc sucker's sensitive habitat is in the very interior reaches of the Project, refraining

from entering it would not significantly impinge on public safety concerns and justifications for

the Project, but Defendant does not acknowledge this disconnect between its proposal and its

rationale.

Defendant failed to grasp the wide gap that exists between footnote 4 and NEPA's basic

requirements. The agency's decision must contain "a reasonably thorough discussion of the

significant aspects of probable environmental consequences." <u>Neighbors of Cuddy Mountain v.</u>

U.S. Forest Service, 137 F.3d 1372, 1376 (9th Cir. 1998). The agency's decision documents do not identify the location of Modoc sucker habitat vis-à-vis the Project, nor do they identify how much or how close Project work will occur (only that there is a minimum 20' setback for mechanical equipment, (AR 7707-7710 (Hydrology Report at 8-11)). Simply concluding the Project will not impact the habitat skips the necessary NEPA analysis, and oversteps the degree of discretion that should be afforded to the agency especially in light of the missing key information. Defendant does not explain how one singular footnote, without Administrative Record support, can possibly be a "reasonably thorough discussion of the significant aspects of the probable environmental consequences." California v. Block, 690 F.2d 753, 761 (9th Cir. 1982). Nor does it explain how, without record support, the agency decision regarding the Modoc sucker can be anything but "uninformed." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 351 (1989).

### c. No Modoc sucker surveys considered.

The Modoc sucker PDM requires surveys every two years. AR 549-550 (Sucker Plan at 7-8). No 2016 or 2018 surveys are in the Administrative Record, and Defendant claims that "future surveys" will determine the species' status. AR 262-265 (BE/BA at 9, 12). But this action will only occur *after* damage from logging is already done. Pushing responsibility for establishing such baseline ignores Defendant's duties under NEPA to identify and analyze reasonably foreseeable impacts of the Project. See City of Davis, 521 F.2d at 676; Northern Plains Res. Council, Inc., 668 F.3d at 1078-79. Failure to adhere to the PDM violates the LRMP and the APA, and reliance on "future surveys" does not give the Project the "hard look" NEPA requires.

    d.   <u>Inadequate consideration of riparian and stream area treatments and impacts to the Modoc sucker.</u>[9]

Riparian habitat supports the Modoc sucker's habitat. Project maps indicate ground salvage logging and shrub removal will occur in RCAs and SMZs (see AR 48-52 (EA at 6-10, 29); AR 7706-7710(Hydrology Report at 7-11)) which are in close proximity to the Wildlife Area. Compare (AR 322 (Wildlife Area map)) and AR 7724-7725 (Hydrology Report at 25-26 ground salvage work and RCA maps)), thus very closely – if not merely feet - upstream, alongside, and downstream of the Wildlife Area. Defendant generally states waters "within treatment areas" (AR 49) (EA at 7) leading to Dutch Flat Creek as ephemeral, but only proposes a "zero to 20 feet" buffer for these streams. AR7707 (Hydrology Report at 8). Thus Defendant's suggestion that logging effects will only occur "outside" the Modoc sucker area is unsubstantiated, and lead to an arbitrary conclusion. See, e.g., AR 53 (EA at Fig. 3 at 11 (treatment areas and private lands); Hydrology Report at 4, at App. 3 (ground salvage work and waters) and Fig. 3 (RCAs)). The Project does not identify how many RCA acres are targeted for treatment are "adjacent to" or near Modoc sucker habitat. Defendant failed to adequately disclose and analyze how the Modoc LRMP resource requirements effect (harm or benefit) the Modoc sucker. The Modoc LRMP requires Defendant to "maintain or improve riparian-dependent resources," which includes SMZs, meadows, seeps, and wetlands. AR 14435 (Modoc LRMP Management Direction 4-3).

    e.   <u>Sedimentation and erosion</u>

---

[9] Any deference Defendant may be entitled to on scientific and technical matters only applies when the agency can confirm their implementation. See, e.g., <u>Defenders of Wildlife v. Babbitt</u>, 958 F.Supp. 670, 685 (D.D.C. 1997) (citation omitted) (court must only defer to agency expertise to the extent the agency utilizes rather than ignores expert analysis). Failure to identify the habitat in relation to the Project, and to properly classify the streams and the appropriate IDFs, demonstrate the agency has not met its burden and is not entitled to deference.

The Modoc sucker is a vulnerable species. Sedimentation and erosion already threaten the Modoc sucker. AR 547 (Sucker Plan at 5) ("erosion and riparian fence failure in the Dutch Flat Wildlife Area remain a concern for sediment introduction and degradation of Modoc sucker habitat."); AR 7711 (Hydrology Report at 12) (sedimentation in Dutch Flat Creek already near concern levels); AR 265 (BE/BA at 12). Grazing is a primary threat to the Modoc sucker's habitat degradation, including in the Dutch Flat Creek Wildlife Area. During Project planning, Defendant acknowledged sedimentation problems *already* existed. AR 7711 (emphasis added) (Hydrology Report at 12) (sedimentation in Dutch Flat Creek already near concern levels); Johnston Decl. ¶ 22 (observed sediment transport during Project planning). Defendant does not account for increased sedimentation from the Project once underway. Johnston Decl. ¶ 22 (evaluated pre-Project "current sediment delivery"). Nothing supports Defendant's generalized conclusions that no harm will come to the sucker, or evaluate the Sucker Plan requirements. For ephemeral streams, the Project will still remove trees. AR 59 (EA at 17) ("Equipment may reach in and remove trees by full suspension only."). Removing trees and clearing the land in riparian areas will increase the amount of sedimentation available to be transported. The EA suggests that all sedimentation from ephemeral channels will simply "stop" 100 meters from the Dutch Flat Creek, but acknowledges during extreme rain, snow, or heavy rainfall events (such as the area experiences in winter and spring) "sediment would be transported to the [Dutch Flat Creek] via these tributaries." AR 71 (EA at 29). Thus, if the Project, as proposed, is permitted to occur, the Modoc sucker's habitat may become inundated with sedimentation. Failure to take a hard look at the reasonably foreseeable environmental consequences of a proposed action violates NEPA. See

<u>Te-Moak Tribe of Western Shoshone of Nevada . U.S. Dept. of Interior</u>, 608 F.3d 592, 599 (9th

Cir. 2010) (citation omitted).[10]

    F.   <u>Project does not meet snag size, density, and habitat requirements.</u>

Defendant's litigation position that the SNFPA does not apply to the Project is

contradicted by its voluntary adoption of the SNFPA on the issue of snags for Project planning.

While the SNFPA and Modoc LRMP differ, as a general matter both plans focus on snag

density, diameter, and habitat recruitment snag requirements. The Project satisfies none of these.

Under NEPA, NFMA, and the APA, Defendant must meet *both* safety and ecological

considerations for snag size, density and habitat requirements; here, it did the first to the

exclusion of the second.

Defendant did not address snag diameter size, either for culling or for retention. The

Project addresses snag height as it relates to worker safety (2.5 tree lengths from burning snags)

(AR 68, EA at 26), and initially included (but abandoned) the 2012 Hazard Tree Guidelines

(wildlife habitat snags that are tall enough to hit a target should be removed) (AR 8583 (Hazard

Tree Guidelines at 14)). Modoc LRMP Guideline 4-30(4)(A) suggests snags be a minimum

height of 20 feet (AR14462 (Modoc LRMP 4-3)), but does not address this requirement, or snag

dbh. Snag diameter requirements are an essential factor in snag density calculations. SNFPA

Forest-wide S&Gs focus more heavily on dbh than height, but require retention of "large" snags.

AR 10159 (SNFPA ROD at 38). See, e.g., AR 14462-63 (Modoc LRMP Forest Wide S&Gs 4-30

---

[10] During litigation, Defendant argued that sedimentation is actually good for the fish (Johnston Decl. ¶ 23) despite the record confirming it is already a threat and concern. Moreover, Defendant presented a new bald and unsupported concept of an (unidentified) road "stopping" sediment transport. These positions are inconsistent with the record. See AR 8202 ("Road Sediment Production and Delivery: Processes and Management") (roads chronic sources of sediment runoff); AR 8213 ("Thesis: Sediment Production and Delivery from Forest Roads in the Sierra Nevada, California") (sediment delivery vital to assess and predict watershed effects).

to 4-31 (snags greater than 24" dbh are the basis of snag density requirements));[11] AR 10158 (SNFPA at 38 ("very large" snags greater than 45" dbh are desired conditions for Goshawk PAC stands)).

In roadside treatment areas, the Project intends to remove all snags on the basis of safety concerns. AR 89-90 (EA at 47-48). In salvage areas, the Project proposes retaining "a minimum" of 3 snags per acre in the largest representative diameter size class", but it stretches the basis for calculating these snags by "averaging" that standard *across the Project* by incorporating large snags from RCAs and inoperable areas. AR 52 (EA 10). The Project is less stringent than the SNFPA Forest-wide S&G snag density requirement for eastside pine and eastside mixed conifer forest types which is "three of the largest snags *per acre*." AR 10172 (SNFPA ROD at 51). The Project also fails to satisfy NFMA. Defendant's approach also runs afoul a primary purpose of snag retention, recruiting and maintaining wildlife habitat.

Defendant recognizes Goshawk may take advantage of increases in prey availability from increases in snag and downed wood resulting from high intensity burned areas, but simultaneously acknowledged the Project snags and future downed woody debris would be reduced within salvage units and may reduce the quality of goshawk foraging in salvage units in the "short term." AR 95 (EA at 53). Defendant does not specify what "short term" means, or explain how "short term" relates to the need for 15", 24", or 45" dbh snags that take decades if not centuries to grow as discussed by the forest plans. See, e.g. AR 10160 (SNFPA ROD at 38 (snags greater than 45 inches dbh and snag and down woody material levels higher than average)). Modoc LRMP Standard 4-30(4)(A) requires Defendant to "[p]rovide habitat

---

[11] Pit RCD's RFB estimates thousands of trees that are $\geq$ 15" dbh for the Project. Holmes Decl. Ex. 6 (Pit RCD RFB at 27-31 (July 12, 2018)). The EA indicates that significant Project acreage is CWHR 4M and 4D categories (between 11" to 23.9" dbh). AR 89-91 (EA at 47-49).

conditions for viable populations of snag-dependent species by meeting the snag requirement targets…". AR 14462. Defendant asserts that "6,682 acres of fire-killed snags would remain unharvested". AR 95 (EA at 53). This information is meaningless without identifying the acreage in relation to the PACs, the basis for the calculation, whether those acres are affected by logging, and snag diameter and density.

G. Post-decision abandonment of tree guidelines violates NEPA, NFMA, and the APA.

Defendant's decision relied on its 2011 Marking Guidelines for Fire-Injured Trees for the salvage and roadside work, and the roadside work also would use the 2012 Hazard Tree Guidelines. AR 52-54 (EA at 10-12). The purpose of these Guidelines is to make tree-cutting determinations in a scientific and standardized fashion approved by the Forest Health Protection staff ("Their use is highly encouraged and fully supported") see, e.g. AR 8570, 8580, 8583 (2012 Hazard Tree Guidelines at 1, 11, 14). After Project implementation (and this lawsuit),[12] Defendant decided the guidelines were "impractical" (ECF No. 22 n. 3), and changed course to cut trees in interior salvage units by "Leave Tree Mark" and by "Designation by Prescription" ("DxP") FSM 2441.2. See ECF No. 22-1 (Decl. Chris Christofferson) ("Christofferson Decl.) ¶¶ 4-5. By throwing the 2012 Hazard Tree Guidelines out the window, *no one* can determine which trees are actual public safety threats, and which trees are viable snags providing valuable wildlife habitat. Defendant did not indicate *who* is now making determinations that the Forest Service would have made: is it the Defendant, Pit RCD, or the loggers? The AR is silent.

Both of these changes are problematic. The adopted Leave Tree Mark designations retain only the three largest snags "*per area.*" Christofferson Decl. at ¶ 4. This conflicts with the EA. AR 52 (EA at 10 (snag retention is a "minimum" of 3 snags *per acre* in largest representative

---

[12] In fact, Defendant must have done so very early on in the Project because the AR includes no form or marking cards from any point in Project's process.

diameters size, averaged across the unit); 45, 47 (3 largest snags per acre). As discussed

elsewhere, this standard is even lower than the LRMP. The Modoc LRMP Timber Management

Directions say trees destroyed by fire may be harvested if they are in stands five acres or larger,

and if 75% of the standing trees have been killed. AR 14495 (Modoc LRMP 4-63). Despite its

position that the Cove fire devastated the forest, Defendant does not address this LRMP

provision, but concedes stands in the Dutch Flat PAC are only burned 1– 50% (AR 96) (EA at

54) which arguably would allow for greater retention of these trees and greater protection of

clumps of trees than the 2011 and 2012 Guidelines. The DxP FSM 2441.2 applies the 2011 Fire

Injured Trees Guidelines, but it transfers the action of selecting the trees for harvest from

Defendant to the commercial operator. Christofferson Decl. Ex. 1. In this Project, where the

interior salvage units contain large mature trees, Defendant's post-decisional action allows the

fox into the henhouse. Regarding the roadside units, Defendant similarly transferred selection of

trees to the commercial operator; it did so after the DN/FONSI, and it did so without

consideration for its other duties, such as re-mapping the PACs (which could incorporate some

roadside trees that are still green and alive). Providing no further information, it "strains

credulity" to claim these changes would have no effect. See Barnes v. U.S. Dept. of Transp., 655

F.3d 1124, 1137 (9th Cir. 2011).

    H.  Project fails to satisfy economic requirements and violates NFMA, NEPA, and the
           APA.

The primary purpose of the BVFSYU Policy is "to provide the maximum feasible

permanent support to the Big Valley community from the lumber industry" by maintaining

steady employment opportunities, employing local resident labor, provide for local lumber

needs, and sufficient facilities to dry and plane approximately 50% of the total production

locally. AR 14746-47 (BVFSYU Policy, Appendix R to the Modoc LRMP). To this end, the

BVFSYU Policy requires that not less than 80 percent of all National Forest sawtimber sold in the unit must be given primary manufacture within the Big Valley Community. Id. At the time the BVFSYU Policy was written, there were sawmills *established* in the Big Valley area "with a total capacity more than sufficient to utilize the budgeted sawtimber cut off the Unit." Id. sale to "consider" established sawmills and their total capacity. Id. The EA relies on "potential new" and "future" mills instead of "established" mills, and logging companies in Modoc County, California, and Oregon. AR 81. Such speculation is too far removed and remote to be relied to justify the Cove Project. See City of Davis, 521 F.2d at 676; Northern Plains Res. Council, Inc., 668 F.3d at 1078-79. Additionally, the mill logging the Project is in Alturas, not in the BVSYU. AR 81-82 (EA at 39-40); AR 14746-47 (Modoc LRMP App. R-1).

I. Failure to properly appraise and modification contract prejudice the Project decision-making, violate NFMA, and are arbitrary or capricious.

1. Appraisal

Standardized valuation methodologies and competitive bidding processes are the backbone of timber sales selling public natural resources. NFMA requires Defendant to sell National Forest resources at not less than the appraised value. 16 U.S.C. § 472a(a); see also 36 C.F.R. § 223.117(b) (sustained yield release units) and 36 C.F.R. § 223.85(a) (noncompetitive sales); AR 14746-47 (BVFSYU Policy) (national forest sawtimber to be offered on a competitive basis and "standard Forest Service appraisal methods will be used in arriving at advertised rates.") Instead of standard appraisal methods, the "value" for the Project was based on the amount Pit RCD was willing to pay (Holmes Decl. Ex. 7 (Pit RCD Cove Fire Bid Tubit at 6-7)), and that this amount was heavily influenced by a prior 2014 Black Mountain Stewardship Contract with Pit RCD, plus two unspecified green sales to sweeten the deal. AR 15943 (Pit RCD Public Presentation at 8).

Defendant's EA (and Draft EA) estimated that the Cove Project would harvest 6.3 MMBF timber to produce up to $630,000 in timber harvest receipts which "could pay for associated fuels reduction and reforestation activities." AR 80 (EA at 38). The Cove Stewardship Contract financials show the 2014 Black Mountain biomass treatment project estimated at $788,400, and the appraisal value of the *Cove* Project at $3,249.60. AR 16077-78 (Stewardship Contract Appendix at 4-5). Defendant's decision documents do not disclose its rationale for any association between the two projects' valuation. The AR does make clear, however, that Cove Project is in fact, a "break with traditional approaches" and the first pilot project in a "new approach" "for increasing pace and scale of forest health projects" to "develop projects through a lens of unlimited resources" and "unlimited dollars" by joining logging interests and the federal government. See AR 15936, 15957, 15939, 15942 (Pit RCD Public Presentation at 1, 22, 4, 6). The Cove Project was designed to also include "two NEPA ready 'green sales' to minimize risk of partner investment." AR 15943 (Pit RCD Public Presentation at 8). Ultimately, Defendant sold the Cove Project for $5,353.25 to the only bidder, Pit RCD. Holmes Decl. Ex. 4; Holmes Decl. Ex. 6 (Pit RCD RFB at 31-32) (proposing $2,610 for Barber Canyon and $959.50 for the Dutch Flat). Defendant did not conduct an appraisal using standardized methods and competitive processes, or give the Project's economic justifications the requisite "hard look", and failed to "foster and promote economic requirements of present and future generations of Americans" as required by NEPA. 42 U.S.C. § 4331.

2. Stewardship modification contract predetermined Defendant's decision.

On April 18, 2018, Pit RCD signed a Stewardship Contract with Defendant purporting to "modify" a 2014 Black Mountain project contract. AR 10442 (Stewardship Contract).[13] The Black Mountain contract was for a green timber sale, with a watershed restoration component, on a completely different district in the Modoc. AR 10451 (Stewardship Contract). Before the Cove Draft EA public comment period ended on May 29, 2018, Defendant signed the "modification" contract with Pit RCD on April 30, 2018. AR 10442 (Stewardship Contract). As part of the arrangement with Pit RCD, Defendant was to pay $30,000 to Pit RCD upon signing. AR 16065 (March 20, 2018 email). Three months later, Pit RCD was the "sole bidder" on the Cove Project. Holmes Decl. Ex. 4. Based on the facts, and the Defendant's finding of no significant impact, and Pit RCD's winning of the bid was all but assured. Such a transaction undermines NEPA. See 40 C.F.R. § 1502(g) (NEPA documents "shall serve as the means of assessing the environmental impact proposed agency actions, rather than justifying decisions already made."); Save the Yaak Committee v. Block, 840 F.2d 714, 716-17 (9th Cir. 1988) ("After major investment of both time and money it is likely that more environmental harm will be tolerated.").

## VI. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court find that the Defendant violated NEPA, NFMA, and the APA; remand the matter to the agency; and vacate the agency's DN/FONSI and ESD.

Respectfully submitted this 4th day of April, 2019.

---

[13] Modification contracts apply in very limited situations: only when the modification will apply to unexecuted portions of the contract and will not be injurious to the United States; or for rate re-determinations; or to prevent environmental damage; or to conform to forest plans. 36 C.F.R. § 223.112; § 223.113. The Stewardship Contract as modified does not satisfy these requirements, and is so far removed from the original 2014 Black Mountain contract that it should not stand as a "modification." Any argument that Cove is "merely" a modification of the 2014 Black Mountain contract is contrary to the regulations, and arbitrary or capricious, and beyond the reasonable bounds of the intent of modification contracts.

/s/ Rachel Fazio
(as authorized 4/4/19)
RACHEL FAZIO

/s/ Elisabeth A. Holmes
ELISABETH A. HOLMES
*Pro hac vice*

Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2019, I filed the foregoing document electronically through the Court's CM/ECF system, which caused all parties or counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

/s/ Elisabeth A. Holmes
Elisabeth A. Holmes
Blue River Law, P.C.
Counsel for Plaintiff