UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

CONSERVATION CONGRESS,

        Plaintiff,

   v.

UNITED STATES FOREST SERVICE,

        Defendant.

No.  2:18-cv-02404-JAM-CKD

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

I.   INTRODUCTION

Plaintiff Conservation Congress sued Defendant United States Forest Service ("the Forest Service") after the Forest Service approved the Cove Fire Salvage and Restoration Project (the "Project").  Presently before the Court are cross-motions for summary judgment, a request for judicial notice, and two motions to strike.  For the reasons set forth below, the Court GRANTS IN PART and DENIES IN PART Plaintiff's Request for Judicial Notice, GRANTS Defendant's Motion to Strike, GRANTS Plaintiff's Motion to Strike, DENIES Plaintiff's Motion for Summary Judgment, and GRANTS Defendant's Motion for Summary Judgment.[1]

---

[1] This motion was determined to be suitable for decision without oral argument.  E.D. Cal. L.R. 230(g).  The hearing was scheduled for July 30, 2019.

II.   STATUTORY AND FACTUAL BACKGROUND

A.   National Environmental Policy Act

The National Environmental Policy Act (NEPA) "is a procedural statute that requires the federal government to carefully consider the impacts of and alternatives to major environmental decisions." Native Ecosystems Council v. Weldon, 697 F.3d 1043, 1051 (9th Cir. 2012) (citing 42 U.S.C. §§ 4321, 4331).  NEPA requires that federal agencies take a "hard look" at the environmental consequences of their proposed actions and then inform the public about the agency's decision-making process. Kern v. U.S. Bureau of Land Mgmt., 284 F.3d 1062, 1066 (9th Cir. 2002).

While agencies must carefully consider significant environmental impacts through the NEPA process, they are "not required to do the impractical." Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt., 387 F.3d 989, 992–93 (9th Cir. 2004) (internal citations, alterations, and quotation marks omitted). "Although an agency's actions under NEPA are subject to careful judicial scrutiny, courts must also be mindful to defer to agency expertise, particularly with respect to scientific matters within the purview of the agency." Id. at 993.

B.   National Forest Management Act

The National Forest Management Act (NFMA) "charges the Forest Service with the management of national forest land, including planning for the protection and use of the land and its natural resources." All. for the Wild Rockies v. United States Forest Serv., 907 F.3d 1105, 1109 (9th Cir. 2018).  The Forest Service develops land and resource management plans ("forest

plans"), 16 U.S.C. § 1604, that summarize the "broad, long-term plans and objectives for the entire forest." Weldon, 697 F.3d at 1056. Forest plans include guidelines to help achieve the NFMA's goals, including consideration of both economic and environmental concerns, preservation of diversity in plant and animal communities, and research on the effects of forest management. 16 U.S.C. § 1604(g)(3).

"After a forest plan is approved, the Forest Service implements the forest plan when approving or denying site-specific projects." Weldon, 697 F.3d at 1056. Courts must defer to the Forest Service's reasonable interpretation of its own guidelines, overturning the agency's decision only if it is plainly erroneous or inconsistent with the forest plan. Forest Guardians v. U.S. Forest Serv., 329 F.3d 1089, 1098 (9th Cir. 2003). "A project is consistent if it conforms to the applicable 'components' of the forest plan, including the standards, guidelines, and desired conditions that are set forth in the forest plan and that collectively establish the details of forest management." All. for the Wild Rockies, 907 F.3d at 1109-10. Although a forest plan's "standards" require strict adherence, the Forest Service may deviate from the plan's "guidelines" if the agency documents the rationale for the deviation. Id.

C. The Modoc Land and Resource Management Plan

The Forest Service adopted the Modoc National Forest Land and Resource Management Plan ("Modoc LRMP") in 1991, Admin. R. ("AR") 10331-10402, which governs management of the Modoc National Forest. In 2004, the Forest Service incorporated the Sierra Nevada Forest Plan Amendment (SNFPA)'s management

3

direction, AR 10119-94, into the existing Modoc LRMP, AR 10136.
The changes adopted in SNFPA do not apply to certain plans and
projects, including the Big Valley Federal Sustained Yield Unit
("the Big Valley Unit").  Id.

The Big Valley Unit aims to "provide the maximum feasible
permanent support to the Big Valley community from the timber
industry" by employing local residents to harvest timber and
manufacturing timber products within the unit.  AR 10329-30.

D. The Cove Fire Salvage and Restoration Project

In July 2017, the Cove Fire burned over 30,000 acres of
grass, brush, and timberlands.  AR 1.  Over half of the National
Forest Service lands impacted by the fire experienced high to
very high burn severity.  AR 45.  Following the Cove Fire, the
Forest Service designed and implemented the Project to recover
the economic value of killed or damaged trees; reduce safety
hazards along roads; improve the forest's ability to withstand
future wildfires; and accelerate habitat development in areas
deforested by the fire.  AR 46.  All Project activities are
within the boundaries of the Cove Fire, in the Big Valley Ranger
District of the Modoc National Forest and within the Big Valley
Unit.  AR 43.  Although the Project is exempt from the SNFPA
because it is within the Big Valley Unit, the Project
incorporated goals from the SNFPA in addition to the Standards
and Guidelines from the Modoc LRMP.

The Forest Service issued a Decision Notice and Finding of
No Significant Impact ("FONSI") on July 12, 2018.  AR 1-9.  Based
on review of the record, including the Environmental Assessment,
AR 35-122, and public comments, AR 10584-10643, the Forest

4

Service decided to implement the Project.  AR 2.  The Forest Service approved the Project under an Emergency Situation Determination ("ESD"), AR 10-11, which allows project implementation without being subject to the predecisional objection process.  36 C.F.R. § 218.21(d).  As of March 2019, 67% of the sawlog volume authorized for removal under the Project had been scaled and hauled to mills.  Def.'s Status Report, ECF No. 69.

E. Procedural Posture

Conservation Congress filed suit on August 31, 2018.  Compl., ECF No. 1.  A month later, the organization filed a Motion for Preliminary Injunction, ECF No. 11, to enjoin the Project's implementation.  Following the Court's denial of the Motion for a Preliminary Injunction, ECF No. 26, Conservation Congress appealed and sought an injunction pending appeal, ECF No. 28.  The Court denied an injunction pending appeal, ECF No. 43, and granted Conservation Congress's motion to amend the complaint, ECF No. 47.  The Ninth Circuit affirmed the Court's denial of a preliminary injunction on May 21, 2019.  Mem. Order, ECF No. 80.

Conservation Congress filed its First Amended Complaint, containing nine claims, on December 19, 2018.  Am. Compl., ECF No. 48.  In April 2019, Conservation Congress filed its Motion for Summary Judgment, Pl.'s Mot. Summ. J., ECF No. 75; Pl.'s Mem. in Supp. of Mot. Summ. J. ("Pl.'s Mem."), ECF No. 75-1, and a Request for Judicial Notice, Req. Judicial Notice ("RJN"), ECF No. 74.  The Forest Service filed its Motion for Summary Judgment on May 31, 2019, Def.'s Mot. Summ. J, ECF No. 82; Def.'s Mem. in

Supp. of Mot. Summ. J. ("Def.'s Mem."), ECF No. 82-1; moved to strike portions of Conservation Congress's declarations, Def.'s Mot. Strike, ECF No. 83; and opposed the request for judicial notice, RJN Opp., ECF No. 85. Conservation Congress then moved to strike portions of a declaration filed by the Forest Service, Pl.'s Mot. Strike, ECF No. 87, in response to the Forest Service's opposition to its Request for Judicial Notice.

### III.  STANDARD OF REVIEW

Courts review alleged violations of the NFMA and NEPA under the Administrative Procedure Act (APA). All. for the Wild Rockies, 907 F.3d at 1112. The APA directs reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Judicial review under the "arbitrary and capricious" standard is narrow and deferential. Motor Vehicle Mfrs. Assn of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). A court may not "substitute its judgment for that of the agency." Id. "This deference is highest when reviewing an agency's technical analyses and judgments involving the evaluation of complex scientific data within the agency's technical expertise." League Of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen, 615 F.3d 1122, 1130 (9th Cir. 2010) (citing Lands Council v. McNair, 537 F.3d 981, 993 (9th Cir. 2008) (en banc), overruled on other grounds by Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7 (2008)).

Agencies are required to "examine the relevant data and articulate a satisfactory explanation for its action." <u>Turtle Island Restoration Network v. U.S. Dep't of Commerce</u>, 878 F.3d 725, 732 (9th Cir. 2017) (internal quotation marks and citation omitted). An action is arbitrary and capricious where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or if the agency's decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." <u>Turtle Island</u>, 878 F.3d at 732-33 (internal quotation marks and citation omitted).

IV.   OPINION

A. <u>Evidentiary Objections</u>

Section 706 of the APA provides for judicial review of federal administrative actions based upon "the whole record or those parts of it cited by the party." 5 U.S.C. § 706. Thus, APA review is generally limited to the administrative record before the agency at the time it made the decision. <u>Citizens to Pres. Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 420 (1971); <u>Lands Council v. Powell</u>, 395 F.3d 1019, 1029 (9th Cir. 2005).

There are, however, narrow exceptions to this general rule. <u>Powell</u>, 395 F.3d at 1030. "In limited circumstances, district courts are permitted to admit extra-record evidence: (1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision,

(2) if the agency has relied on documents not in the record,

(3) when supplementing the record is necessary to explain

technical terms or complex subject matter, or (4) when

plaintiffs make a showing of agency bad faith." Id. (internal

quotation marks omitted). Courts narrowly construe and apply

these exceptions. Id. ("Were the federal courts routinely or

liberally to admit new evidence when reviewing agency decisions,

it would be obvious that the federal courts would be proceeding,

in effect, de novo rather than with the proper deference to

agency processes, expertise, and decision-making.").

### 1. Plaintiff's Request for Judicial Notice

Conservation Congress requests that the Court take judicial

notice of seven exhibits pursuant to Federal Rule of Evidence

201. RJN at 1–4. Those exhibits are (1) the Modoc National

Forest, Schedule of Proposed Action (SOPA) for January 1, 2018

to March 31,2018 and April 1, 2018 to June 30, 2018, ECF No. 74-

2; (2) a printout of the Project webpage, dated April 4, 2019,

ECF No. 74-3; (3) a printout of the Modoc National Forest's

advertised timber sales, dated March 14, 2019, ECF No. 74-4;

(4) a Report of Timber Sale, dated July 26, 2018, ECF No. 74-5;

(5) a Forest Service press release lifting fire-area closure

orders, dated September 5, 2017, ECF No. 74-6; (6) a Request for

Bid by the Pit Resource Conservation District, issued July 12,

2018, ECF No. 74-7; and (7) a Request for Bid Response Packet

from Tubit Enterprises, dated July 20, 2018, ECF No. 74-8. The

Forest Service opposes the RJN with respect to most of the

exhibits, arguing that the documents were either post-decisional

or not otherwise before the agency at the time of the Project's

approval.  RJN Opp'n at 2.

     "A judicially noticed fact must be one not subject to
reasonable dispute in that it is either (1) generally known
within the territorial jurisdiction of the trial court or
(2) capable of accurate and ready determination by resort to
sources whose accuracy cannot reasonably be questioned."  Fed.
R. Evid. 201(b).  "A court shall take judicial notice if
requested by a party and supplied with the necessary
information."  Fed. R. Evid. 201(d).

     The Forest Service does not oppose the April to June 2018
SOPA, which lists the Cove Project and is a pre-decisional
record.  Id. at 5 n.3.  Accordingly, the Court will take
judicial notice of the page of Exhibit 1 that lists the Project,
ECF No. 74-2, p. 8.  The other portions of Exhibit 1 are not
relevant, and the Court will not consider them.

     The Court denies Conservation Congress's RJN as to the six
other exhibits because they are either inappropriate for
judicial notice under Federal Rule of Evidence 201 and/or
irrelevant under Rule 401.  Exhibit 2 of the RJN is already part
of the record.  AR 10645.  Exhibits 3, 4, and 7 are post-
decisional documents, which the agency could not have relied
upon at the time of the decision.  Much like how agencies may
not supply post-hoc rationalizations for their actions, "post-
decision information . . . may not be advanced as a new
rationalization either for sustaining or attacking an agency's
decision."  San Luis & Delta-Mendota Water Auth. v. Jewell, 747
F.3d 581, 603 (9th Cir. 2014).

     Finally, Exhibit 5 and Exhibit 6 both fail the narrow

criteria for admission of extra record evidence.  Exhibit 5, which states that road closures are lifted and warns of continued danger due to wildfire, was not relied upon by the Forest Service in approving the Project.  Exhibit 6 is a record from a different entity that similarly was not relied upon in the Forest Service's approval of the Project.  There are no allegations of bad faith or technical subject matter that Exhibits 5 and 6 could explain, and the exhibits' are not necessary to determine if the Forest Service considered relevant factors in its decision.

Conservation Congress's RJN is granted as to page 8 of Exhibit 1 and denied as to all other exhibits.

### 2. Defendant's Motion to Strike

The Forest Service moves to strike portions of Conservation Congress's Declarations, ECF Nos. 65–68, 73, 77, 79, on the grounds that the declarations go beyond standing assertions and improperly include legal argument and extra-record photos and documents.  Def.'s Mot. Strike, ECF No. 83.  Conservation Congress opposes the motion, arguing that the declarations were submitted for the sole purpose of establishing the standing of Conservation Congress and its members.  Pl.'s Opp'n Strike, ECF No. 85, p. 4.

The Court agrees with the Forest Service that portions of Conservation Congress's declarations exceed the permissible boundaries of establishing standing.  The declarations contain legal conclusions about the arbitrariness or capriciousness of agency actions, extra-record information and photos not considered by the agency, and disputes about the scientific

methodology employed by the agency in evaluating species'
habitat needs.  Such information is not relevant to the members'
standing and will not be considered by the Court.  The Forest
Service does not dispute that Conservation Congress and its
members have standing to challenge the Project's approval.

For the reasons articulated in the Forest Service's motion
and reply, the Court will strike the following portions of the
declarations that are irrelevant to Conservation Congress's
standing: Declaration of Lyle Lewis, ECF No. 65 ¶¶ 9, 11-20, 23-
30; Declaration of Denise Boggs ECF No. 66 ¶¶ 21-105 and Exs. 1-
5; Declaration of Douglas Bevington ECF No. 67 ¶¶ 14, 16, 23-26
and Ex. 1; Declaration of Chad Hanson, ECF No. 68 ¶¶ 9-11, 15-19
and Ex. 2; Original Declaration of Kyle Haines, ECF No. 73
¶¶ 21-25, 27-30, 32-33, 39; Unsigned Supplemental Declaration of
Kyle Haines, ECF No. 77 ¶¶ 1-10 and Exs. 1-12; Signed
Supplemental Declaration of Kyle Haines, ECF No. 79 ¶¶ 1-10 and
Exs. 1-12.

### 3. Plaintiff's Motion to Strike

Conservation Congress moves to strike portions of the
Supplemental Declaration of Chris Christofferson, ECF No. 82-2,
for offering post-decisional rationalizations, legal
conclusions, and statements unsupported by the administrative
record.  Pl.'s Mot. Strike, ECF No. 87, p. 2.  Conservation
Congress argues that it would be prejudiced should the Court
deny its RJN but allow the Forest Service to rely on
Christofferson's Supplemental Declaration.  Id.  It seeks to
exclude the following paragraphs from Christofferson's
Supplemental Declaration: ¶¶ 3, 5, 7, 11-23.

11

The Court has reviewed Christofferson's Supplemental Declaration and does not find admission of the extra-record facts within it are necessary to determine whether the agency has considered all relevant factors and explained its decision. See Powell, 395 F.3d at 1030. As the Court will not be considering post-decisional arguments as a basis upon which to challenge the agency's decision, admission of Christofferson's post-decisional explanations is not necessary.

The Court grants Plaintiff's Motion to Strike and excludes the identified portions of Christofferson's Supplemental Declaration.

B. Cross-Motions for Summary Judgment

1. Standing

To fulfil the case-or-controversy requirement of Article III, a plaintiff must satisfy three elements of standing. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). First, the plaintiff must have suffered an "injury in fact," which is concrete and particularized, as well as actual and imminent. Id. Second, the injury must be caused by the defendant's conduct, such that it can be fairly traced to the challenged action. Id. Third, it must be likely that a favorable decision will redress the injury. Id. at 561.

"An organization has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Ecological

Rights Found. v. Pac. Lumber Co., 230 F.3d 1141, 1147 (9th Cir. 2000) (internal quotation marks omitted). A plaintiff satisfies the "injury in fact" in an environmental case where an individual shows "an aesthetic or recreational interest in a particular place, or animal, or plant species and that that interest is impaired by a defendant's conduct." Id.

Conservation Congress's declarations are sufficient to demonstrate standing on most of its claims. The organization's members have a protected interest in the area of the Modoc forest where the Project is taking place, and that the Project, a final agency action, may impair their interests. The Court has not considered the stricken portions of the declarations in arriving at that conclusion.

Some of Conservation Congress's claims expand beyond the grounds upon which the organization has standing. The Forest Service has challenged Conservation Congress's standing on its appraisal and contract modification arguments, which appear to be part of its seventh and ninth claims. Def.'s Mem. at 26. The Forest Service argues that Conservation Congress may not challenge the sales agreement on several grounds, including that the organization lacks a personal injury because it was not a bidder and because the contract is not a final agency action reviewable under the APA. Id. at 26–28.

The most factually analogous case is Alliance for the Wild Rockies v. Pena, No. 2:16-CV-294-RMP, 2018 WL 4760503 (E.D. Wash. Oct. 2, 2018), cited by the Forest Service. In Pena, an environmental organization challenged the Forest Service's bidding contract and contract award on a logging project under

the NFMA and NEPA.  Id. at *3-6.  The district court held that the organization lacked standing because it did not suffer an injury-in-fact and lacked a procedural right to challenge the bidding process.  Id.  Conservation Congress has not provided any contrasting precedent or statutory support for their standing argument on these issues.

Cases challenging Forest Service timber appraisals and sale contracts been brought by bidders pleading an injury from the alleged irregularity.  See, e.g., Capital Dev. Co. v. United States, 49 Fed. Cl. 178 (2001), aff'd sub nom. Seaboard Lumber Co. v. United States, 308 F.3d 1283 (Fed. Cir. 2002) (denying a timber purchaser's challenge to the Forest Service's appraisal method); Roseburg Lumber Co. v. Madigan, 978 F.2d 660(Fed. Cir. 1992) (affirming a decision of the United States Department of Agriculture Board of Contract Appeals that disputed the accuracy of timber appraisal); Prineville Sawmill Co. v. United States, 859 F.2d 905 (Fed. Cir. 1988) (reversing a decision of the United States Claims Court in a pre-award bid protest action against the Forest Service regarding sale of salvage timber). Conservation Congress has not shown such an injury or procedural right, and accordingly it lacks standing to challenge the Forest Service's appraisal of the Project value and its stewardship agreement with the Pit River Conservation District.

     2.  Claim I: Notice of Environmental Review Documents and Bidding Sale

In its first claim, Conservation Congress alleges that the Forest Service violated NEPA and the APA by failing to follow the regulations regarding public notification of timber sales

14

and environmental review documents. Am. Compl. at 23 ¶¶ 110-17. First, it alleges that the Forest Service advertised for less than seven days about the emergency removal of timber, in violation of 36 C.F.R. § 223.81. Am. Compl. at 23 ¶ 111. Second, it alleges that the Forest Service failed to advertise its timber sale contracts for at least 30 days, in violation of 36 C.F.R. § 223.302 and § 223.80. Id. ¶ 113. Third, it alleges that the Forest Service failed to properly notify the public of the Environmental Assessment, Notice of Decision and FONSI, and the bidding process and sale.

### i. Applicable Requirements

Regulation requires "[t]he responsible official . . . [to] promptly make available the final EIS or the EA, and a draft Record of Decision (ROD) or draft Decision Notice (DN) and Finding of No Significant Impact (FONSI)" to eligible parties. 36 C.F.R. § 218.7(b). Then the agency must post a digital image of the legal notice or Federal Register publication within four calendar days of the publication. 36 C.F.R. § 218.7(d).

The regulations differ slightly for circumstances like those present here, where the Project was approved under an ESD and as part of a stewardship agreement. The Forest Service may "enter into stewardship contracting projects with private persons or other public or private entities to perform services to achieve land management goals for the national forests and the public lands that meet local and rural community needs." 16 U.S.C. § 6591c(b). Within a stewardship agreement, "the value of timber or other forest products [may be] removed as an offset against the cost of services received under the agreement," with

the value of the timber determined "using appropriate methods of appraisal." 16 U.S.C. §§ 6591c(d)(4)(A), (d)(4)(B)(i). "In emergency situations where prompt removal of timber included in a sale is essential to avoid deterioration or to minimize the likelihood of the spread of insects, the approving officer may authorize shortening the formal advertising period to not less than 7 days." 36 C.F.R. § 223.81.

For projects approved under an ESD, regulations require "[t]he responsible official . . . [to] notify interested and affected parties of the availability of the EA, FONSI and decision notice, as soon as practicable after the decision notice is signed." 36 C.F.R. § 220.7(d). ESD Projects may proceed immediately after this notification, without being subject to the predecisional objection process. 36 C.F.R. § 218.21(d)(1).

## ii. Timber Sale Advertising

Conservation Congress's arguments premised on the advertisement of the timber sale fail. Pit Resource Conservation District published a notice of timber for sale on May 10, 2018, AR 10441, cancelled it for May 17, 24, and 31, AR 10440, and then published another notice on July 5, 2018. AR 10439. Bids were listed as being due by July 11, 2018. Id. The Forest Service approved the Project on July 12, 2018. AR 9. No public bids were accepted or sales contracts awarded prior to the Project's approval, and thus they are not part of the administrative record.

As an initial matter, the Court notes the parties' disagreement about whether the stewardship agreement exempts the

16

Project from the timber sales advertising requirements that would otherwise apply.  Compare Def.'s Mem. at 4-5 (arguing that 16 U.S.C. § 6591c(d)(5) exempts contracts from the requirements of 16 U.S.C. § 472a(d) and 36 C.F.R. § 223.81) with Pl.'s Reply, ECF No. 88, p. 7 n.3 (arguing that the sale advertisement requirement still applies).  Nevertheless, the Court need not resolve these cursory arguments because even if the requirement applies, the record supports that Pit Resource Conservation District advertised the bid for a sufficient length of time. The Forest Service and its stewardship partner need not have advertised the contract for 30 days, 36 C.F.R. § 223.80, because a shortened seven-day period applies in emergency situations "to avoid deterioration or to minimize the likelihood of the spread of insects."  36 C.F.R. § 223.81.  Pit Resource Conservation District advertised the timber for sale publicly in the Modoc County Record at least seven days.  AR 10439.

     Although it appears that the advertisement began prior to when the Forest Service approved the Project, there is no evidence that bids were accepted or that a sale took place prior to Project approval.  As the record does not indicate that the early advertisement rendered the bidding process anything other than open and fair to the bidding public, the premature advertisement was an "inconsequential, technical deficienc[y]."  Cf. Oregon Envtl. Council v. Kunzman, 817 F.2d 484, 492 (9th Cir. 1987) (stating that reviewing courts should not find NEPA documents to be insufficient on the basis of immaterial deficiencies).

     As detailed in the standing analysis above, Conservation

Congress lacks the standing to challenge the bidding process and sale conducted by the Pit River Conservation District because, as a non-bidder, it suffered no injury-in-fact from the alleged violation.  See, e.g., Pena, 2018 WL 4760503, at *5 ("[A] mere violation of a statutory duty by an agency does not cause an injury to a plaintiff without some showing that the particular plaintiff had a procedural right under the specific statute in question.").

### iii. Public Notification of Environmental Documents

Conservation Congress's improper notice argument as to the environmental review documents is similarly without merit.  The Forest Service engaged in an early and open scoping process, 40 C.F.R. § 1501.7, including public notices seeking scoping comment on the Project in early February 2018.  AR 10560-62. The February Scoping Letter to the Public, AR 10563-66, disclosed that the Forest Service was seeking an ESD, as required by 36 C.F.R. § 218.24(b)(3).

The Forest Service listed the Project in its April 1, 2018 to June 30, 2018 Schedule of Proposed Action (SOPA), ECF No. 74-2, p. 8, as required by 36 C.F.R. § 220.4(d) and published notice of the Project's draft Environmental Assessment in April 2018, AR 10579-81.  Interested parties had until May 26, 2018, 30 calendar days of the publication, to submit comments.  AR 10580-81.  The Forest Service received the ESD and signed the Project's Decision Notice and FONSI on July 12, 2018.  AR 9. The Decision Notice identified that the Project was granted an ESD, AR 7-8, as required by 36 C.F.R. § 218.21(e).  Two weeks later, on July 26, 2018, the Forest Service posted the

notification on its website.  AR 10645-46.  Conservation

Congress takes issue with that two-week delay.  Pl.'s Reply at

7.

Regulations require the Forest Service to notify interested

and affected parties "as soon as practicable after the decision

notice [was] signed."  36 C.F.R. § 220.7(d).  While a two-week

delay is less than ideal, Conservation Congress has not provided

precedent demonstrating that this delay was contrary to law.

Therefore, the Court grants summary judgment to the Forest

Service on Conservation Congress's first claim.

3. Claim II: ESD Notice

In its second claim, Conservation Congress alleges the

Forest Service violated the APA by failing to timely notify the

public about the ESD.  Am. Compl. at 23-24 ¶¶ 118-128.  This

claim fails on two grounds.

First, the regulation Conservation Congress relies upon, 36

C.F.R. § 220.7(d), does not include ESDs in its list of required

documents that must be shared "as soon as practicable after the

decision notice is signed."  Id. (listing "the EA, FONSI and

decision notice").  The Forest Service complied with the

regulations that do pertain to ESDs by disclosing it in the

February 2018 Scoping Letter, AR 10563-66, and notifying the

public it was granted in the Project's approval, AR 7-8.  See 36

C.F.R. § 218.24(b)(3); 36 C.F.R. § 218.21(e).

Second, as stated above, Conservation Congress has not

provided any legal support for its argument that a two-week

delay between the documents' signing and when the Forest Service

posted them on its website was unlawful.  The regulations do not

define "as soon as practicable" and Conservation Congress has not provided binding or persuasive precedent that the two-week delay is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

The Court grants summary judgment to the Forest Service on Conservation Congress's second claim.

### 4. Claim III: Satisfaction of ESD Criteria

In its third claim, Conservation Congress alleges the Forest Service's designation of the Project as an emergency situation was unlawful because it failed to consider relevant information. Am. Compl. at 25 ¶¶ 130–34.

Regulations define an "emergency situation" as:

> A situation on National Forest System (NFS) lands for which immediate implementation of a decision is necessary to achieve one or more of the following:
>
> [a.] Relief from hazards threatening human health and safety;
>
> [b.] [M]itigation of threats to natural resources on NFS or adjacent lands;
>
> [c.] [A]voiding a loss of commodity value sufficient to jeopardize the agency's ability to accomplish project objectives directly related to resource protection or restoration.

36 C.F.R. § 218.21(b) (formatting added). The Chief and the Associate Chief of the Forest Service make the determination that an emergency situation exists based on an examination of the relevant evidence. 36 C.F.R. § 218.21(c).

There was not a lengthy delay in requesting the ESD. See All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1137 (9th

Cir. 2011) (disapproving of an unexplained two-year delay in requesting an ESD). The Forest Service began gathering information to request an ESD within approximately six months of the Cove Fire, AR 10509, and submitted the request in June 2018. AR 23–34. The Project's objectives overlap with the aims of regulatory definition of an emergency situation: to "reduce safety hazards along roads as well as in treatment areas, recover the value of fire-killed trees, reduce the danger and difficulty of suppressing future wildfires, and accelerate forested conditions and habitats in burned forest." AR 24.

The ESD Request supports those objectives with a data-backed assessment of the potential loss in commodity value over time. AR 30–33 (estimating that Ponderosa pine deteriorates 80% in two years and 93% in three years, and that incense cedar deteriorates 45.7% in two years). The estimates of a loss in value of $280,000 by August 2018 and $725,500 by August 2019 support the Forest Service's argument that delaying the sale "would result in a precipitous decline of timber receipts." AR 31. Additionally, the Forest Service estimates that contracting for hazard tree removal alone would incur a cost of $336,000. AR 33. These estimates affirm that the Project would "avoid[] a loss of commodity value sufficient to jeopardize the agency's ability to accomplish project objectives directly related to resource protection or restoration." 36 C.F.R. § 218.21(b); see also Cottrell, 632 F.3d at 1136 (finding that a loss of $16,000, or a potential loss of $70,000, was not substantial loss to the Forest Service).

The ESD also referenced the need to fell hazard trees along

roads within Forest system. AR 27. The trees were to be removed if they were dead or dying and intersect the road, or if they are damaged or defective live trees that pose a risk of falling in the next five years. Id. As noted in the response to public scoping comment letter, dead trees rot over time, reducing stability and increasing safety concerns. AR 10610. This purpose is also in accordance with the objective that ESDs provide "[r]elief from hazards threatening human health and safety." 36 C.F.R. § 218.21(b); see also All. for the Wild Rockies v. Farnsworth, 709 F. App'x 461, 462 (9th Cir. 2018) (unpublished) ("Based on the risks from the dead and dying burned trees, however, the Chief's decisions to issue ESDs were neither arbitrary nor capricious.").

Finally, the ESD included information about reducing fuels for future wildfires and reforestation to accelerate development of forested conditions in areas of the Cove Fire. AR 27–28. Such actions fulfil the objective of "mitigat[ing] . . threats to natural resources on NFS or adjacent lands." 36 C.F.R. § 218.21(b).

Conservation Congress has not raised a meritorious argument that the ESD is inconsistent with 36 C.F.R. § 218.21. Having found that the Forest Service did not violate the APA, the Court grants summary judgment to the Forest Service on Conservation Congress's third claim.

     5. Claim IV: The Northern Goshawk

In its fourth claim, Conservation Congress alleges the Forest Service violated the NFMA and APA by failing to comply with the Modoc LRMP's Standards and Guidelines with respect to

the Northern Goshawk, a species of bird.  Am. Compl. at 26-27 ¶¶ 136-43.  Specifically, Conservation Congress alleges the Project fails to (1) "demonstrate compliance with the Modoc LRMP and its Forest-Wide Guidelines and Raptor Management Prescription S&Gs;" (2) "demonstrate timber activity is not located in nest areas (Modoc LRMP at 4-91(2)(G));" (3) "demonstrate LOP and buffer distance compliance (Modoc LRMP at 4-91(1)(G));" (4) "demonstrate enhancement of prey-based habitat within two miles of nest stands (Modoc LRMP at 4-91);" (5) "demonstrate limited road use and construction (Modoc LRMP at 4-91);" (6) "adequately demonstrate compliance with Modoc LRMP Forest Wide S&G 4-26(D)(23)(A) (100 pairs in at least medium habitat);" and (7) "disclose where landings would be built in Northern Goshawk habitat, including the 100 acres of green trees in the Dutch Flat PAC."  Id. ¶ 140.

### i.  Abandoned Arguments

Conservation Congress did not present argument in their summary judgment pleadings about the need to demonstrate limited road use and construction and disclose where landings would be built in Northern Goshawk habitat.  Am. Compl. at 27 ¶ 140. Since Conservation Congress did not offer facts or arguments on these issues within its fourth claim, the Court deems these issues abandoned.  See Weldon, 697 F.3d at 1050.

### ii.  Improperly Exhausted Arguments

The Forest Service argues in a footnote that Conservation Congress may not raise arguments pertaining to the following Standards and Guidelines because it failed to raise the arguments during the scoping and Environmental Assessment

comment periods: (1) Modoc LRMP Standard and Guideline 4-26(2)(A); (2) Modoc LRMP Raptor Management Prescription 4-91; (3) SNFPA Standard and Guideline 76; and (4) SNFPA Standard and Guideline 81. Def.'s Mem. at 7 n.5.

"The Administrative Procedure Act requires that plaintiffs exhaust available administrative remedies before bringing their grievances to federal court," Idaho Sporting Cong., Inc. v. Rittenhouse, 305 F.3d 957, 965 (9th Cir. 2002) (citing 5 U.S.C. § 704), as do Forest Service regulations, 7 U.S.C. § 6912(e), 36 C.F.R. § 214.20. A plaintiff must raise claims "with sufficient clarity to allow the decision maker to understand and rule on the issue raised"; however, there is not a clear-cut standard as to when this requirement has been met. Rittenhouse, 305 F.3d at 965. Courts interpret exhaustion broadly, finding the requirement has been fulfilled so long as the plaintiff provided sufficient notice to the agency to rectify the alleged violations. Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt., 606 F.3d 1058, 1065 (9th Cir. 2010).

The Forest Service's exhaustion argument first mentions Standard 4-26(2)(A), which requires the Forest Service to manage 100 suitable Northern Goshawk nest stands of at least medium habitat capability. AR 14458. Conservation Congress's letter on scoping touches on Modoc LRMP Standards and Guidelines 4-30, 4-31, 4-33, and 4-86, relating to wildlife, AR 10530-33, but does not reference Standard 4-26 or the issues pertaining to this standard. Conservation Congress's comment letter on the Environmental Assessment again references 4-86, AR 10573, and chides the Forest Service for a lack of clarity on Protected

24

Activity Centers (PACs) and inadequate survey disclosures, AR 10572. Conservation Congress's complaints about lack of disclosure regarding Northern Goshawk habitat could be broadly interpreted as a vague reference to the issues within Standard 4-26(2)(A) regarding the number of nest stands. AR 10572. As this issue was not plainly referenced in the comment letters, the Court will allow the Forest Service to supplement the record with a response. Not providing the Forest Service with the opportunity to respond would reward and encourage vague arguments in comment letters, which could conceivably relate to latter-pled claims, but fail to provide adequate notice for the agency to address or correct issues prior to commencement of litigation.

Management Prescription Guidelines 4-91(1)-(3) require the Forest Service to have at least 100 acres of habitat suitable for a Northern Goshawk nest stand and an alternative nest stand; delineate 50 to 100 acres around each known nest stand; designate the highest capable and suitable nest stands, with a secondary priority of avoiding conflict with intensive timber management; and enhance prey base populations within two miles of nest stands as opportunities arise. AR 14523. Much like the challenge to Standard 4-26(2)(A), Conservation Congress's objections generally about Northern Goshawk habitat disclosure could be interpreted to broadly include Guideline 4-91(1). Similarly, the Court will allow the Forest Service to respond with supplemental evidence to issues that were not clearly raised in the administrative process. Conservation Congress's comment letters did not provide sufficient clarity and notice

that it disputed the Forest Service's compliance with the issues
within Management Prescription Guidelines 4-91(2)-(3), see AR
10518-35, AR 10569-74, so those issues were not properly
exhausted.

SNFPA Standards and Guidelines 76 requires a limited
operating period and prohibition of work close to the nest
during breeding season. AR 10181. SNFPA Standards and
Guidelines 81 limits the mechanical treatments in Northern
Goshawk PACs to no more than 5% a year, and 10% a decade. AR
10181. Conservation Congress's comment letters do not touch on
issues related to limited operating periods, Northern Goshawk
breeding season, or limitations on the percent of mechanical
treatment near Northern Goshawk PACs. See AR 10518-35, AR
10569-74. These issues are not properly exhausted.

                iii.  Raptor Standards, Guidelines, and Management
                      Prescriptions

Conservation Congress first takes issue with the Integrated
Design Features incorporated into the Project based on the
Standards and Guidelines of the SNFPA. Pl.'s Mem. at 10-12.
Conservation Congress argues that these features do not relate
to the Modoc LRMP Standards and Guidelines and are not identical
to the wording within the SNFPA. Id.

The Northern Goshawk Integrated Design Features include
Designation of Northern Goshawk PACs, Avoiding Northern Goshawk
Breeding Disturbance, and Northern Goshawk Survey Requirements.
AR 61-62. These features are "resource protection measures that
are developed by specialists and incorporated as part of the
Proposed Action for this project," "in addition to Best

Management Practices (BMPs) and Standards and Guidelines from the Modoc LRMP, as amended." AR 57.

Conservation Congress's arguments about compliance with the SNFPA fail because the Project need not comply with standards from which it is exempt. See AR 10136. The relevant Standards and Guidelines are those within the Modoc LRMP, which are: (1) manage 100 nest stands of at least medium habitat capability, AR 14458; (2) maintain Northern Goshawk territories of at least 100 acres, with no more than twelve miles between them, AR 14523; (3) designate the highest capable nest stands, with a secondary objective of avoiding conflict with intensive timber management, id.; (4) enhance prey base populations within two miles of nest stands as opportunities arise, id.; (5) inventory and protect active Northern Goshawk nest territories necessary to meet population targets, AR 14618. Conservation Congress failed to exhaust its administrative remedies on the last three of the five issues identified.

The Forest Service has demonstrated compliance with the Modoc LRMP Standards and Guidelines by showing that (1) there are over 100 Northern Goshawk PACs in the forest and the Project will not reduce that number below 100, Johnston Decl., ECF No. 22-3, p. 9 ¶ 19; (2) there is at least one Northern Goshawk territory per 18 square miles, with 18 Northern Goshawk PACs within 12 miles of the Dutch Flat PAC in the Project area, id.; (3) the Cove Fire, not the Project or conflict with intensive timber management, damaged nest stands in the Project area, AR 96–97; (4) there were no occupied nest stands in the area at the time the Project was approved around which to enhance prey

27

populations, id.; and (5) 2018 survey and inventory records indicated there were no active nests in the Project area, AR 211.  The Court recognizes that the Johnston Declaration is outside the record but finds that it falls into an admissible exception to the prohibition on extra-record evidence because it is necessary to explain the agency's action in light of the more specific claims presented in litigation than in comment letters.  See Animal Def. Council v. Hodel, 840 F.2d 1432, 1436 (9th Cir. 1988), amended, 867 F.2d 1244 (9th Cir. 1989).

Since the 2018 surveys, a July 2019 survey found a new Northern Goshawk nest outside of the Project's treatment area.  AR 16106-13.  Although the biological studies instruct that Northern Goshawk rarely find dead trees suitable for nesting, AR 4940, "life finds a way."  Ctr. for Food Safety v. Vilsack, 636 F.3d 1166, 1174 (9th Cir. 2011) (quoting Michael Crichton, Jurassic Park 159 (Ballantine 1990)).  As this is a post-decisional factual development, the Court will not consider it as impacting the validity of the Forest Service's compliance with the Modoc LRMP at the time of the decision.  See Tri-Valley CAREs v. U.S. Dep't of Energy, 671 F.3d 1113, 1130 (9th Cir. 2012) ("However, exceptions to the normal rule regarding consideration of extra-record materials 'only appl[y] to information available at the time, not post-decisional information.' ").

The Court does not find that the Forest Service failed to comply with the Modoc LRMP with respect to the Northern Goshawk, and thus has not abused its discretion or acted arbitrarily, capriciously, or otherwise not in accordance with law.  The

Court grants summary judgment to the Forest Service on Conservation Congress's fourth claim.

### 6. Claim V: Riparian Areas and the Modoc Sucker

In its fifth claim, Conservation Congress alleges the Forest Service violated the NFMA, NEPA, and the APA by failing to comply with the Modoc LRMP's Standards and Guidelines and the SNFPA with respect to the Modoc sucker, a species of fish, and riparian areas. Am. Compl. at 27-30 ¶¶ 146-64.

#### i. Riparian Conservation Areas and Stream Management Zones

Conservation Congress challenges the Project's compliance with Modoc LRMP Standards and Guidelines, including the Riparian Area Management Prescription. Pl.'s Mem. at 16-18, 22-24. The organization argues that the Forest Service's stream maps are not sufficiently detailed, that it did not demonstrate it was impossible to maintain 50-70% of old-growth in stream management zones, and that streams were not classified in the environmental documents. Id.; Pl.'s Reply at 11-12, 14-16.

The Riparian Area Management Prescription 4-135 emphasizes the need to protect and enhance riparian-dependent resources while utilizing the habitat for non-dependent resources, including timber harvesting. AR 14567. The Prescription permits "[t]imber [to] be harvested while protecting riparian-dependent resources" and provides several guidelines for timber harvesting. AR 14572-73. One of the guidelines is that the Forest Service should "[m]aintain 50-70% of the timbered sites within SMZs in an old-growth state, where possible." AR 14573. The Forest Service is tasked with rehabilitating and maintaining

streams containing the Modoc sucker.  AR 14575.  Dutch Flat
Creek, within the Project area, is an affected stream.  Id.

Approximately 305 acres of the Project's treatment are
within Riparian Conservation Areas, adjacent to intermittent
streams.  AR 51.  The areas are to be treated using ground-based
mechanical equipment, 238 acres, or hand felling, 67 acres.  Id.
To mitigate the impact, the Project includes 17 Integrated
Design Features and BMPs.  AR 58-60.  Buffer zones will prevent
mechanical equipment from being used along streams, AR 58, and
equipment will be kept off slopes greater than 20%, AR 59.
Riparian tree species will not be removed.  AR 60.  Maps in the
Hydrology Report illustrate the ephemeral and perennial streams,
wetlands, Riparian Conservation Areas, and ponds.  AR 7724-25.

Conservation Congress has not shown that the Hydrology
Report's stream maps were inadequate because it has not shown
that the Modoc LRMP requires the level of specificity
Conservation Congress desires.  Similarly, Guideline 4-141 does
not require the Forest Service to prove impossibility of
maintaining a timbered site—it guides to maintain 50-70% of the
desired conditions "where possible."  AR 14573.  Given the
extent of fire damage documented in the record and the removal
of only fire-damaged trees, the Forest Service has shown
compliance with this guideline.  Similarly, the Appendix listing
stream classifications describes stream types within the forest
but does not contain a requirement that every stream within a
project be labeled with a classification in project
documentation.  AR 14752.

Conservation Congress has not shown that the Forest Service

failed to comply with the Modoc LRMP with respect to Riparian
Conservation Areas and Stream Management Zones.

### ii.  Modoc Sucker Analysis

Conservation Congress's complaints about the Project
documentation with respect to the Modoc sucker include
(1) insufficient detail about habitat in relation to the
Project; (2) lack of Modoc sucker surveys in the analysis;
(3) Project activity too close to Modoc sucker habitat; and
(4) the risk of Project-caused sedimentation to Modoc sucker
habitat.  The Court will focus on Modoc LRMP-specific issues in
this section and address other issues in the "hard look"
analysis section, below.

When the Modoc LRMP was drafted, the Modoc sucker was
federally listed as an endangered species.  AR 14617.  The fish
was delisted in 2015, as it no longer met the definition of an
endangered or threatened species.  AR 523-37.  The Modoc LRMP
Standard 4-26(1)(C) requires the Forest Service "manage all
streams containing Modoc suckers as directed in the Riparian
Area Management Prescription and the Modoc Sucker Recovery
Action Plan."  AR 14458.

The Biological Evaluation for the Project found that the
Project will have no effect on the Modoc sucker.  AR 303.  It
notes that the fish used to occupy Dutch Flat Creek, but recent
droughts may have eliminated its habitat.  AR 262.  At the time
of delisting, populations of the Modoc sucker in Dutch Flat
Creek were presumed lost due to hybridization with Sacramento
suckers.  AR 544, 546.

The Forest Service concluded that the subwatershed in which

treatment will occur is not hydrologically connected to Dutch
Flat Creek.  AR 49 n.4.  The Project provides for snag retention
in the Riparian Conservation Areas that will help trap sediment,
AR 51, road repairs and maintenance to lower peak flows and
sediment delivery, AR 71, and use of erosion hazard mitigation
measures where needed, AR 60.  The Forest Service does not
expect much sediment transport into Dutch Flat Creek due to its
ephemeral tributaries.  AR 71.

Conservation Congress has not shown that the Forest Service
has failed to comply with the Modoc LRMP with respect to the
Modoc sucker and its habitat.  The Court grants summary judgment
to the Forest Service on Conservation Congress's fifth claim.

### 7. Claim VI: Snag Density and Snag Diameter

In its sixth claim, Conservation Congress alleges the
Forest Service violated NEPA, the NFMA, and the APA by not
disclosing compliance with the Modoc LRMP Standards and
Guidelines regarding snag diameter and snag density
requirements.  Am. Compl. at 30–32 ¶¶ 167–77.

### i.   Abandoned Arguments

Conservation Congress did not present argument in their
summary judgment pleadings about reservation and designation of
trees for future snags under Modoc LRMP Forest-wide Standards
and Guidelines 4-30 and 4-31, AR 10347–48; North Adin Management
Area Direction 4-185, AR 10359; or Table 5-1, AR 14674–91.  Am.
Compl. 31-32 ¶¶ 171, 173. Since Conservation Congress did not
offer facts or arguments on these issues within its sixth claim,
the Court deems these issues abandoned.  See Weldon, 697 F.3d at
1050.  The Court will focus on the issues Conservation Congress

presented in its briefing, including the dispersion of snags, snag size, and habitat recruitment requirements. Pl.'s Mem. at 24–26.

ii.  <u>Standards and Guidelines for Snag Retention</u>

A snag is a standing dead tree or portion thereof. 29 C.F.R. § 1910.266. Modoc LRMP Standards and Guidelines 4-30(A) directs the Forest Service to meet an average total density of 1.5 snags per acre in suitable timber lands (1.2 snags/ acre of 15–24" DBH and 0.3 snags/acre of >24" DBH) and 0.5 snags per acre in low productivity timberlands. AR 10347. It notes that "[a]s dictated by natural diversity, snag requirements cannot be met on every acre." <u>Id.</u> Forested lands within each timber compartment are used to assess the average density, with no more than five snags per acre counting to determine that average density. <u>Id.</u> Snags must be at least twenty feet tall. <u>Id.</u>

The Project complies with this standard because it plans to retain at least three snags per acre of the largest representative diameter size, averaged across the unit. AR 52. The only excluded area of the Project where snags will not be retained is the roadside hazard area. AR 54, 8386 (noting snags will be retained at least 150 feet from the road). Although the Project does not list a prescribed diameter at breast height (DBH) for the retained snags, its requirement that the largest snags be retained acknowledges the "natural diversity" of the area while striving to meet the size requirements. AR 52, 8375.

Additionally, Modoc LRMP Standards and Guidelines 4-30(A) instructs the Forest Service to "[p]rovide habitat conditions for viable populations of snag-dependent species by meeting

33

those snag requirement targets."  AR 10347.  The Forest Service
complied with this standard as well by meeting the snag-
retention minimum and aiming to locate snag retention clumps
"adjacent to northern goshawk PACs and around suspected or known
wildlife-inhabited trees (e.g. cavities, defects, etc.), and
around existing green forest patches."  AR 52.  Under the
Project, "[a]pproximately 6,682 acres of fire-killed snags would
remain unharvested . . . representing about 84 percent . . .
burned by the Cove Fire."  AR 95.  The Project's snag retention
does not violate the Modoc LRMP's standard to provide habitat
for snag-dependent species.

The Forest Service complied with the Modoc LRMP's snag
standards, and it therefore has satisfied the NFMA and the APA.
The Court grants summary judgment to the Forest Service on
Conservation Congress's sixth claim.

### 8. Claim VII: "Hard Look" at the Project

In its seventh claim, Conservation Congress alleges the
Forest Service violated NEPA and the APA by failing to
adequately disclose and analyze direct, indirect, and cumulative
effects and by not taking a "hard look" at the Project prior to
approval.  Am. Compl. at 33–35 ¶¶ 179–88.

#### i.   Abandoned Arguments

Conservation Congress did not present argument in their
summary judgment pleadings about Forest Sensitive Species and
Management Indicator Species such as the black-backed woodpecker
and bats; water withdrawal and water use for dust abatement;
road maintenance level classifications; road construction; and
the cumulative environmental impact of other local timber sales.

1   See Am. Compl. 34-35 ¶ 185(f), (h), (j)-(l).  As to the 2011 and

2   2012 Marking and Hazard Tree Guidelines, Conservation Congress's

3   argument focused on post-decision abandonment of the 2012

4   Guidelines and not about whether the abandonment of those

5   guidelines had been given a "hard look" prior to the decision.

6   See Am. Compl. 34-35 ¶ 185(c).  Since Conservation Congress did

7   not offer facts or arguments on these issues within its seventh

8   claim, the Court deems these issues abandoned.  See Weldon, 697

9   F.3d at 1050.

10                ii.   Economic Justifications

11       Conservation Congress's economic justification argument

12  appears to allege that the Project is not compliant with Big

13  Valley Unit requirements and relies on speculation to justify

14  the Project.  Pl.'s Mem. at 27-28.  The Court analyzes the

15  organization's timber appraisal arguments, id. at 28-30, in

16  their ninth claim.

17       The bidding advertisement stated that the sale was in

18  accordance with the terms of the Big Valley Unit; however, it

19  also noted bids would be considered from other purchasers if no

20  compliant bids were received.  AR 10439.  The Environmental

21  Assessment considered the lack of presently operating mills in

22  the area and suggested that potential new mills could purchase

23  the timber and contribute to the local economy within the unit.

24  AR 81.  Conservation Congress challenges the Project's

25  compliance with the Big Valley Unit, Pl.'s Reply at 19 n.11, but

26  provides no statute or precedent that voids the Big Valley Unit

27  policies when no mills are operating within its boundaries.  See

28  36 C.F.R. § 223.117(b) (permitting the Forest Service to offer

timber for sale within sustained yield units).

Review of the economic portion of the Environmental Assessment, AR 80-82, illustrates that the Forest Service took a "hard look" at the local economy in the Big Valley Unit and determined that the Project could result in receipts of up to $630,000 for the Forest Service, helping to finance future fuel reduction and reforestation activities, rather than incurring costs to remove hazard trees. The record indicates that the Forest Service took a "hard look" at the economic issues prior to arriving at its decision.

### iii.  Rapid Assessment of Vegetation Change Data

Conservation Congress challenges the 2017 Rapid Assessment of Vegetation Change survey data used by the Forest Service in arriving at suitability determinations for species, arguing it is unreliable. Am. Compl. at 34 ¶ 185; Pl.'s Reply at 10.

The Forest Service's 2017 survey showed the burn severity in the Cove Fire perimeter. AR 45. The Rapid Assessment of Vegetation Change process provides information about the basal area loss within a fire perimeter and the vegetation affected by fire within 45 days of a fire's containment. AR 8406. The rapid deployment of this surveying technology coincides with the Forest Service's view that completing the Project before timber deterioration was an emergency situation. The Forest Service has continued to conduct surveys in addition to its use of the 2017 data. See AR 210-14; 16106-13.

While the failure to "discuss and consider" an independent report that an agency supervisor directed be addressed lends weight to a "hard look" challenge, Blue Mountains Biodiversity

1  Project v. Blackwood, 161 F.3d 1208, 1213 (9th Cir. 1998),

2  Conservation Congress has not pointed out available reports or

3  data that the Forest Service neglected to include.  NEPA

4  requires federal agencies to "carefully consider detailed

5  information concerning significant environmental impacts," but

6  does not require agencies "to do the impractical."  Klamath-

7  Siskiyou Wildlands, 387 F.3d at 992-93 (internal citations,

8  alterations, and quotation marks omitted).  "Although an

9  agency's actions under NEPA are subject to careful judicial

10  scrutiny, courts must also be mindful to defer to agency

11  expertise, particularly with respect to scientific matters

12  within the purview of the agency."  Id. at 993.

13     Conservation Congress has not provided information that the

14  Forest Service's reliance on the Rapid Assessment of Vegetation

15  Change process and use of its data is violative of NEPA or the

16  APA.

17           iv.   Effects on the Modoc Sucker

18     Conservation Congress further alleges that the Forest

19  Service did not take a "hard look" on the direct, indirect, and

20  cumulative effects of the Project on the Modoc sucker and its

21  habitat.  Am. Compl. at 34 ¶ 185.

22     As referenced above, the Forest Service determined that the

23  Modoc sucker was not going to be affected by the Project because

24  the Project was designed to avoid the Dutch Flat Creek

25  floodplain.  AR 49, 265.  The documentation identified its

26  relevant habitat—Dutch Flat Creek—and provided maps illustrating

27  the subwatersheds and the Project area.  AR 7700, 7724.  The

28  Forest Service found that the majority of the treatment area is

in a different subwatershed that is disconnected from Dutch Flat Creek, AR 265, which Conservation Congress disputes, Pl.'s Mem. at 19. In areas of scientific and technical expertise, such as hydrological and sediment calculations, the Court defers to the agency. United States v. Alpine Land & Reservoir Co., 887 F.2d 207, 213 (9th Cir. 1989). The Court will not second-guess the Forest Service's hydrological calculations where there is no evidence in the record that contradicts them.

Conservation Congress also contends that the Forest Service must conduct Modoc sucker surveys every two years or it has violated the Modoc sucker Post-Delisting Monitoring Plan, AR 538-55. Pl.'s Mem. at 21. The Plan acknowledges the Forest Service's "increasingly constrained budgets and limited resources," and notes that the Forest Service "may" complete monitoring of habitat conditions "[a]s funding permits." AR 549. The Plan goes on to recommend a complete survey of previously surveyed areas every two years for a 10-year period but does not task the Forest Service with completing that survey. Id. Conservation Congress has not shown that the Forest Service is in violation of a legal duty to perform Modoc sucker surveys.

The Environmental Assessment, Biological Evaluation, and the Hydrological Evaluation together support that the Forest Service took a "hard look" on the Project's potential impact to the Modoc sucker and its habitat.

v.   Effects on the Northern Goshawk

Conservation Congress goes on to allege that the Forest Service did not take a "hard look" on the direct, indirect, and

cumulative effects of the Project on the Northern Goshawk's nesting, foraging, PAC use, and habitat. Am. Compl. at 34 ¶ 185. The organization misidentifies the Northern Goshawk as a Management Indicator Species, Pl.'s Mem. at 10, although the bird has been off the list for over a decade. AR 10101-03.

The Forest Service included the Northern Goshawk as a sensitive species in its analysis, AR 94, and concluded that "[m]ost of the suitable goshawk nesting and foraging habitat [in the Project area] was burned by the Cove Fire." AR 95. The Environmental Assessment found that altering the post-fire habitat "may reduce the quality of salvage units for northern goshawk foraging in the short-term," but these "minor short-term reductions . . . would be minimized to some extent" by other aspects of the Project. AR 95-96. The Forest Service included direct and indirect effects of the Project, AR 95-97, as well as consideration of cumulative effects caused by private land salvage and personal fuelwood salvage, on the Northern Goshawk. AR 97-98. Although Conservation Congress would have preferred the PACs to be remapped before the Project, it has not identified a legal requirement for the Forest Service to do so.

The record indicates that the Forest Service took a "hard look" at the Project's direct, indirect, and cumulative effects on the Northern Goshawk and its habitat.

### vi.   Effects on Riparian Areas

Next, Conservation Congress alleges that the Forest Service did not take a "hard look" on the direct and indirect effects of the Project on riparian areas. Am. Compl. at 34 ¶ 185. Specifically, the organization challenges the Project's

identification of riparian and stream areas, consideration of
treatment in the riparian and stream areas, and analysis of
sedimentation.  Pl.'s Mem. at 16–18, 22–23.

   The Hydrology Report notes that Dutch Flat Creek is
adjacent to, rather than inside, the Project area.  AR 7704,
7724.  It lists the activity restrictions within a specified
width of Streamside Management Zones and Riparian Conservation
Areas, AR 7707, and the Integrated Design Features to be
implemented to help meet the Riparian Conservation Objectives,
AR 7708.  Subwatersheds, streams, wetlands, Riparian
Conversation Areas, ponds, Project area, and the Cove Fire
perimeter are identified in maps.  AR 7700, 7724–25.  The Report
goes on to identify the direct and indirect effects that the
Project is predicted to have on stream flow, water quality,
channel morphology, and riparian areas, wetlands, and
waterbodies, as well as the cumulative effects analyzed by
modeling Equivalent Roaded Acres.  AR 7709–12.  It finds that
the risk of sedimentation from the Project is low because the
groundcover will increase, the streams in the Project area are
seasonal, and the Project will use BMPs.  AR 7709–10.

   Based on the environmental review documents in the record,
the Court finds that the Forest Service took a "hard look" at
the Project's potential impact on riparian areas.

           vii.   Effects of Livestock Grazing

   Finally, Conservation Congress alleges that the Forest
Service did not take a "hard look" on the indirect and
cumulative effects of livestock grazing and expansion in the
Project area, particularly effects on Forest Service Sensitive

40

species, Management Indicator Species, and riparian areas. Am. Compl. at 34 ¶ 185. Most of Conservation Congress's grazing argument is in a footnote of its memorandum. Pl.'s Mem. at 15 n.5.

Conservation Congress argues that the Project includes opening up the area for grazing without considering the effects of the decision. Pl.'s Mem. at 15 n.5. As noted in the record, however, the Project does not include decisions related to livestock grazing, which is separately addressed through the Barber Canyon Allotment. AR 9640. The environmental review documents considered the impacts of grazing not affiliated with the Project and determined that the more open forest structure facilitated by the Project would improve livestock distribution, potentially relieving grazing pressure from other areas. AR 9642-44. The Environmental Assessment planned for additional allotment inspections, as well as resource condition and end of season monitoring. AR 58.

Although Conservation Congress may not agree with the particular results of the Forest Service's inquiry, the agency need only take a "hard look" at the environmental consequences of its actions—not select at the most environmentally-sensitive outcome. See Ctr. for Biological Diversity v. Ilano, 928 F.3d 774, 777 (9th Cir. 2019) ("NEPA 'does not mandate particular results, but simply prescribes the necessary process.' "). Conservation Congress has not shown that the Forest Service failed to take a "hard look" at the effects of grazing in the Project area.

The Court grants summary judgment to the Forest Service on

Conservation Congress's seventh claim.

9. <u>Claim VIII: Marking of Fire-Injured and Hazard Trees</u>

In its eighth claim, Conservation Congress alleges the Forest Service violated the NFMA, NEPA, and the APA by failing to mark fire-injured and hazard trees according to the applicable guidelines. Am. Compl. at 35-36 ¶¶ 191-200. The organization contends that if the Forest Service is not using the 2011 Marking Guidelines for Fire-Injured Trees ("2011 Guidelines") or the 2012 Hazard Tree Guidelines ("2012 Guidelines), there is no way to determine which trees are safety threats and which individuals are making that determination. Pl.'s Mem. at 26.

The Environmental Assessment provides that the 2011 Guidelines, AR 8610-24, will be used to identify dying trees in roadside treatment areas, and the 2012 Guidelines, AR 8570-8609, will be used to identify live damaged and defective trees for removal. AR 54. Under the 2011 Guidelines, trees with a 50% chance of death within striking distance of roads are selected for removal and trees in other areas are selected for removal if they are 70% or more likely to die. AR 51, 54. The Forest Service subsequently discontinued use of the 2012 Guidelines, Opp'n Mot. Prelim. Inj., ECF No. 22, p. 8 n.3, relying on the 2011 Guidelines for guidance in selection. As use of the 2012 Guidelines is "highly encouraged" but not mandatory, this is not violative of the NFMA, NEPA, or the APA.

Conservation Congress's challenge to the Forest Service's use of "Designation by Prescription" similarly fails because this method of designation is authorized by statute. 16 U.S.C.

§ 472a(g)(3) ("Designation by prescription and designation by description shall be considered valid methods for designation, and may be supervised by use of post-harvest cruise, sample weight scaling, or other methods determined by the Secretary of Agriculture to be appropriate.").

Modoc LRMP Guideline 4-63(1) provides that "[t]rees destroyed by fire, insects, or disease may be harvested if they are in stands of 5 acres or larger, and if 75% of the standing trees have been killed." AR 14495. This guideline applies to Semi-primitive Non-motorized Dispersed Recreation areas. Id. Conservation Congress has not shown that this guideline applies to the Project area.

Conservation Congress has not shown that the Forest Service violated the NFMA, NEPA, or the APA as to its environmental review or conduct regarding tree selection, designation, or marking. The Court grants summary judgment to the Forest Service on Conservation Congress's eighth claim.

### 10. Claim IX: Timber Appraisal and Sale

In its ninth claim, Conservation Congress alleges the Forest Service violated the NFMA, NEPA, and the APA by failing to disclose the timber appraisal and by selling the timber at less than appraised value. Am. Compl. at 37-38 ¶¶ 203-16. Conservation Congress alleges based on a presentation from the Pit Resource Conservation District, AR 15936-64, that the Forest Service engaged in improper appraisal and sale, in violation of 16 U.S.C. § 472a(a).

Prior to conducting a timber sale, the Forest Service is required to estimate the fair market value of timber proposed to

43

be sold.  36 C.F.R. § 223.60.  The NFMA prohibits the Forest

Service from selling timber for less than its appraised value.

16 U.S.C. § 472a(a).  The Forest Service establishes minimum

stumpage rates, "base rates," at which timber must be sold at or

above.  36 C.F.R. § 223.61.  The Forest Service has discretion

in choosing the method of appraisal.  36 C.F.R. § 223.60.

As the Court found in the standing section, Conservation

Congress lacks standing to challenge the Project's appraisal and

its contracts with its Stewardship Agreement partner, the Pit

River Conservation District.  The Court grants summary judgment

to the Forest Service on Conservation Congress's ninth claim.

C. Violations of Court Orders and Local Rules

The motions considered in this order involved lengthy and

technical briefing, made all the more challenging by Conservation

Congress's "kitchen sink" approach complaint-drafting: including

nearly a dozen potential challenges within each claim, only for

many to be silently abandoned on summary judgment.  See Gurman v.

Metro Hous. & Redevelopment Auth., 842 F. Supp. 2d 1151, 1153 (D.

Minn. 2011) (criticizing "kitchen-sink" complaints as

"pernicious" because they "unfairly burden defendants and courts"

with the task of "identifying the plaintiff's genuine claims and

determining which of those claims might have legal support.").

Given the caseload crisis in the Eastern District of California,

it is imperative that parties reasonably investigate their

claims, plead only viable claims, and plead those claims

concisely and clearly.

In the extensive briefing on the motions, both parties

committed a variety of violations of the Court's Order re Filing

Requirements and the Local Rules. The Court issued its Order re Filing Requirements ("Order") on August 31, 2018. ECF No. 3-2. The Order states that memoranda of law in support of and in opposition to all motions other than those under Federal Rules of Civil Procedure 56 and 65 are limited to 15 pages and reply memoranda are limited to five pages. Id. at 1. Page limits for cross-motions for summary judgment limited to 25 pages for the plaintiff's opening brief; 35 pages for the defendant's opposition and cross-motion; 20 pages for the plaintiff's reply and opposition; and ten pages for the defendant's reply. Id. at 3. The Order cautions parties against filing multiple briefs to circumvent this rule. Id. The Order also states that an attorney who exceeds the page limits must pay monetary sanctions of $50.00 per page and that the Court will not consider any arguments made past the page limit.

The parties' briefing violated the spirit, if not the letter, of the Court's Order, as well as the Eastern District of California Local Rules. Conservation Congress violated Local Rule 130(b) in its Memorandum in Support for Summary Judgment, ECF No. 75-1, by failing to use line numbers in the left margin. Both parties are guilty of using an excessive number of single-spaced footnotes in order to evade the Court's page limitations.

The parties also exceeded page limits for reply briefs, which are limited to five pages for the relevant motions. Conservation Congress's reply brief in support of its RJN is 11 pages. See RJN Reply, ECF No. 86. The Forest Service's Reply in support of its Motion to Strike is 11 pages. See Def.'s Mot. Strike Reply, ECF No. 91. Conservation Congress's reply brief in

support of its Motion to strike is seven pages. <u>See</u> Pl.'s Mot. Strike Reply, ECF No. 98. In sum, Conservation Congress exceeded the page limitations by a total of eight pages ($400) and the Forest Service by a total of six pages ($300). The Court has not considered any arguments made after the fifth page of the parties' reply briefs for these motions. Both parties are ordered to pay their respective monetary sanctions within ten days of the date of this Order.

V.  ORDER

For the reasons stated above, the Court GRANTS IN PART and DENIES IN PART Plaintiff's Request for Judicial Notice, GRANTS Defendant's Motion to Strike, GRANTS Plaintiff's Motion to Strike, DENIES Plaintiff's Motion for Summary Judgment, and GRANTS Defendant's Motion for Summary Judgment.

IT IS SO ORDERED.

Dated: September 17, 2019

JOHN A. MENDEZ,
UNITED STATES DISTRICT JUDGE